Henry J. **HODES**, as Trustee of Glover Industries, Incorporated, a bankrupt corporation, Plaintiff,

v.

**HOFFMAN INTERNATIONAL CORPORATION**, Defendant.

**No. 63 Civ. 1446.**

United States District Court
S. D. New York.
March 6, 1968.

Rosen, Lotwin, Kantrowitz, Goldman & Gutin, New York City, for plaintiff, by Walter Kantrowitz, Irving Gutin, New York City, Theodore C. Beckett, Brewer & Myers, Bernard D. Craig, Levy & Craig, Kansas City, Mo.

Di Falco, Field, Florea & O'Rourke, New York City, for defendant, by Edward Cherney, New York City, William Griffin, Rich, May, & Billideau, Boston, Mass.

## OPINION

POLLACK, District Judge.

This is a diversity case. The plaintiff sues for damages by reason of the defendant's breach of a contract for the purchase of 165 coin operated dry cleaning machines.

Glover Industries, Incorporated, was a Missouri corporation engaged in the business of manufacturing various types of machinery for dry cleaning, washing, drying and other related uses. Its principal place of business was at Kansas City, Missouri.

Defendant was and still is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York City, New York. At the times relevant hereto the defendant was engaged in the business of manufacturing and distributing garment pressing and dry cleaning equipment and various other types of equipment and vending machines.

In 1962, the defendant ordered 525 coin operated dry cleaning machines from the plaintiff under various purchase orders. The first of these orders was placed on March 2, 1962 for a quantity of 150 machines; delivery thereof starting May 1, 1962 was to be at the rate of 50 machines per month and payment was to be made within 5 days after submission of invoices. On June 5, 1962 an order was placed for 375 additional machines. The existing delivery quotas for June and July, 1962 were increased by 75 machines spaced in specified quantities and the balance of 300 machines were to be delivered at the rate of 100 per month during the months of August, September and October, 1962.

The machines were ordered in two finishes. Two hundred and twenty five of the machines were ordered in the standard design, a black edge finish, at an agreed price of $2,385. per machine and 300 were ordered in a gilt edge finish with certain valve changes at an agreed price of $2,585. per machine.

It was part of the understanding between the parties that Glover would obtain material sufficient to have on hand four months supply of the material to enable it to keep up with the delivery schedule. Glover did purchase and keep such an inventory of materials on hand.

On July 18, the defendant unexpectedly notified Glover Industries, Incorporated that the defendant was "in a little bit of a bind;" "I am requesting that all steps be taken to immediately slow down on the machines which you now have on hand;" "Get this production down to zero," said the defendant. Glover was further notified by defendant, "Do not proceed on the 300 machine order until written confirmation is received by you." Parenthetically, this written go-ahead was never given. The explanation which the defendant gave was that it was getting too much equipment out into the field and its men did not have enough time to catch up on the installations but it assured Glover that the situation would be resolved within the next few weeks, at which time the defendant would issue further release orders for the equipment.

From the inception of the arrangements until November 2, 1962 Glover had manufactured and delivered to the defendant 158 machines which the defendant accepted and paid for at the price of $2,385. per machine.

On November 2, 1962, Glover became impatient for more delivery instructions and it wrote to the defendant that at the latter's request Glover had held up production of the machines for several months and now found itself in a position where pressure from Glover's suppliers and the burden of its inventories made it imperative to obtain a schedule from the defendant for completing the remaining 367 machines ordered by the defendant.

Between November 2, 1962 and November 29, 1962, defendant requisitioned 22 additional machines from Glover which were accepted by the defendant and also paid for at the price of $2,385. per machine. This left 345 machines

remaining on order and quite clearly the defendant was not in a position to take and pay for them as required by the orders.

Defendant sought and obtained a conference with Glover for the purpose of seeking a modification of its obligations and on November 29, 1962, the parties met and entered into a new agreement. It is the breach of this new agreement which is the basis for the present law suit.

In this new agreement the defendant acknowledged its obligation to purchase from Glover the remaining 345 machines pursuant to the original purchase orders and that the defendant should have accepted and paid for them during May–October 1962. The new agreement then modified this obligation by providing for a reduced quantity to be delivered at a reduced delivery scale and at a price fixed in the agreement. The defendant thereby agreed to buy and pay for 195 standard design machines at a price of $2,585. each F.O.B. Glover's factory in Kansas City to be delivered at the rate of 15 machines per calendar month during the period December 1, 1962–December 31, 1963. The machines were to be shipped in accordance with the defendant's releases and would be sent freight collect and billed by sight draft with bill of lading attached. It was further provided in the new agreement that

> "If Hoffman does take and pay for all 195 standard design machines at the price and within the time and at the rate of delivery specified in this paragraph, *time being of the essence* of this agreement, then Hoffman shall have no further liability or responsibility of any kind under the contracts"

previously described. (Emphasis supplied).

Upon receipt of the November 29 agreement prepared by Glover, the president of Hoffman telephoned Glover to clarify certain points. On December 3, 1962, a letter clarifying the November 29 agreement was mailed to the defendant and on December 5, 1962 the agreement of November 29, 1962 together with the clarification of December 3, 1962 both of which were signed by Glover, were in turn both countersigned "accepted" by the defendant and sent to Glover.

During the months of December 1962 and January 1963, Glover in compliance with the new agreement delivered to the defendant and the defendant accepted and paid for 30 machines at the new price of $2,585. per machine.

The defendant makes the contention that the contract dated November 29, 1962, plaintiff's exhibit 7, was entered into by the mutual mistake of the parties or by mistake of the defendant and the fraud of the plaintiff in providing for the price of $2,585. instead of a price of $2,385. for each machine. The defendant points to the fact that the so-called "standard" machine was priced in the initial orders early in 1962 at $2,385. and that it was for the so-called new design that defendant had agreed to pay the higher price in the June, 1962 orders. Defendant further contends that this price error so-called was called to the plaintiff's attention, but that the plaintiff refused to correct the contract to reflect the price of $2,385. and this refusal is assigned as a justification for the defendant's refusal to issue releases for the additional machines on order. Defendant goes further and claims that by reason of the error $6,000. was overpaid for the 30 machines delivered under the November 29, 1962 agreement and claims that it is entitled to a credit of this $6,000. in addition to the return of a deposit of $37,683. placed with Glover in connection with the orders. Defendant consequently demands judgment on its counterclaims for $43,683.

■ The issue with respect to the matter of the price agreed upon on November 29, 1962 raises essentially an issue of credibility and the Court, on the basis of the documents, the testimony and the demeanor evidence resolves such issue in favor of the plaintiff. The price of $2,585. per machine was the price that defendant undertook

to pay in consideration of Glover's agreement to reduce the quantity of machines which the defendant was then bound to accept from 345 to 195.

The defendant's representative who negotiated the revision of the outstanding orders on November 29, 1962 reported to the president of the defendant what had occurred at the November 29, 1962 meeting where the revised arrangement was tentatively agreed upon. Memoranda contemporaneously drawn up reflected the matters discussed but not in complete detail; the matter of price, which the Court here finds was also discussed, was not mentioned on the memorandum. However, the confirmation letter, plaintiff's exhibit 7 dated November 29, 1962, clearly set forth in unmistakable terms Hoffman's agreement to purchase the 195 standard design machines at a price of $2,585. each, F.O.B. Glover's factory. This confirmation letter was addressed to Lewis S. List, the defendant's representative at the conference. It arrived at the defendant's office and the president reviewed the contract, signed it and sent it back to the defendant. Mr. List claimed that he did not see the letter until about the 9th or 10th of December, 1962. He claimed that about December 12th the president of the defendant telephoned to Mr. Glover with Mr. List on the line and registered a protest against the price at which the machines were being billed, asserting that it was a mistake but that Mr. Glover denied any mistake whatsoever. Mr. Glover testified that some such conversation took place a month later with no indication that Mr. List was listening in or participating. Regardless of when the talk occurred the subsequent acts of defendant were inconsistent with any claim of an improperly elevated price; the defendant issued releases for the delivery of machines under the revised arrangement of November 29, 1962 at the so-called elevated price of $2,585.

The plaintiff's testimony was convincing that the price was fully discussed and agreed upon at the November 29, 1962 meeting as $2,585. per machine;

Mr. Glover so testified and he was corroborated by another witness, by the circumstances, and by the signed agreement.

There is, therefore, no merit to the defenses of mutual or unilateral mistake or fraud as to price.

The defendant continued to request and accept delivery of additional machines in January, 1963 at the price of $2,585. per machine. Its checks issued on January 14, 23, 25, February 7, 20 and March 22, 1963 contained no reference to any price dispute or reservation.

The defendant faced with its own internal problems improperly attempted to relieve itself of its contract obligations to Glover.

The Court finds that the defendant's refusal to comply further with the accord of November 29, 1962 as clarified by the letter of December 3, 1962, plaintiff's exhibit 8, constituted an anticipatory breach of that contract for which there was neither factual nor legal justification.

Glover's financial commitment for the material needed to manufacture the machines together with defendant's failure to take and pay for the agreed monthly quota of machines, placed a severe strain on Glover's cash flow position.

This action was commenced on May 20, 1963 by the filing of a copy of the complaint in this Court relying on the defendant's anticipatory breach of the balance of the contract.

On May 21, 1963, Glover filed a voluntary petition in bankruptcy in the United States District Court for the Western District of Missouri. It was thereupon adjudged a bankrupt and a receiver was appointed to take charge of its assets.

The receiver continued to operate the bankrupt corporation until on or about July 10, 1963 at which time Henry J. Hodes was appointed and accepted the position of Trustee of the bankrupt corporation. Some time later the title of this action was amended by order of

this Court so as to substitute Mr. Hodes, the Trustee, as the plaintiff.

Prior to the bankruptcy, Glover had at all times, been ready, willing and able to perform its obligations under the contract and to deliver the machines called for by the stipulated monthly quotas. Consequently, in the period prior to the date of bankruptcy, the defendant was in default on its obligation to take and pay for 15 machines per month. Certain other considerations apply with respect to the period following the filing of the bankruptcy proceeding which will be dealt with hereafter.

The nature of the damages to which Glover (plaintiff) is entitled depends on whether the machines were already manufactured at the time of the breach of the contract.

Two machines were completed by Glover and delivered on Hoffman's instructions to Porco of Akron, Ohio on or about February 28, 1963. These were not paid for and Hoffman is liable to the plaintiff for the full price thereof of $2,585. apiece or a total of $5,170.

■ Seven machines were completed by Glover and ready for delivery. In the absence of a market price, damages as to these are measured by the difference between the contract price and the proceeds realized upon sale of the goods conducted in good faith to mitigate the defendant's damage. The seven machines were ultimately sold by the Trustee for $1,200. each, a price not unreasonable under the circumstances. The damages to which the plaintiff is entitled on these machines, therefore, total $9,695.

■ When Hoffman breached its obligation under the contract, Glover did not begin to manufacture any further machines included in the order. But plaintiff is entitled to recover the profit it would have made thereon, had the contract been fully performed. He also is entitled to recover the cost of material on hand which Glover had purchased to enable it to fulfill its obligations under the contract, less the value realized on resale of that material. Solomon v. Waterbury Brass Goods Corp., 6 F.2d

990 (C.C.A. 2 Cir. 1925); Lieberman v. Templar Motor Co., 236 N.Y. 139, 140 N.E. 222, 29 A.L.R. 1089 (1923); Wasserman v. Broadalbin Knitting Co., 270 App.Div. 20, 58 N.Y.S.2d 597 (3rd Dept. 1945), affd., 296 N.Y. 815, 72 N.E.2d 11 (1947); See, 5 Williston on Contracts (Rev.Ed.) § 1380.

Analysis of the cost figures for the machine as contended for by defendant's expert shows that the machines were and could be built at an actual cost of $1,875 per machine in 1962 when the business of Glover Industries was conducted in the ordinary and usual way; and at an estimated cost of $2,000 per machine using figures derived from operations in the first four months of 1963 when Glover Industries was experiencing a stringency due materially to defendant's breach of contract.

The estimated higher cost of manufacture in the first four months of 1963 is attributable in material degree to conditions which arose and prevailed by reason of defendant's breach of contract causing suspension of the manufacture of the machines and loss of expected revenues on deliveries of machines to the defendant.

■ The defendant, having been a substantial contributor to distortion of Glover's manufacturing costs, is therefore not entitled to have the higher estimated cost per machine flowing from these conditions considered in determining plaintiff's loss of prospective profits.

Using the 1962 cost figures, the parties are in substantial agreement on the $1,875 cost figure. Accordingly, the Court finds that the plaintiff's (Glover's) prospective profit, measured by the difference between the contract price ($2,585.) (and the plaintiff's estimated cost ($1,875), to be $710. per machine.

This prospective profit is recoverable on the number of machines which Glover (plaintiff) was ready to supply in conformity with the contract during the period from February, 1963 to the date of the bankruptcy. The contract called for 55 machines from which are deducted the two delivered to Porco and

the seven completed machines, leaving 46 machines on which Glover lost its prospective profit of $32,660. which plaintiff is entitled to recover.

The evidence shows that the loss to Glover (plaintiff), on the inventory of material secured to comply with the contract, which directly and naturally resulted in the ordinary course of events from the defendant's breach of contract amounts to $45,051. after crediting the market value realized on the liquidation of that inventory. The cost of the inventory of material on hand at the time of the bankruptcy was $90,221.85; the plaintiff realized $20,100.00 from a sale to Wichita Precision of inventory costing $18,272.72; and inventory costing $17,120.61 was used by the Trustee to manufacture 13 machines which were sold by him. The remainder, costing $53,001.24, was sold at auction for approximately $7,950.10,[1] leaving a net loss of $45,051.05, which the plaintiff is entitled to recover.

█ Defendant has called attention to uncertainties in the proof of inventory damages, among them the failure of plaintiff to establish the exact number and cost of parts attributable to the Hoffman contract and also the exact proceeds realized upon the auction sale. However, the fact of damage resulting from the acquisition of inventory parts was established, and uncertainty as to amount will not preclude an award based upon the reasonable estimate of the trier of the facts. Such an estimate has reached the result stated.

The defendant contends that it is responsible only for the cost of inventory on hand which could have been used to complete 46 machines, or $52,063.48, rather than the $90,221.85 inventory attributable to the entire Hoffman contract. It claims further, in mitigation of damages, that the proceeds of the Wichita sale and the cost of inventory used by the Trustee to manufacture the 13 machines should be deducted from this figure.

Assuming the defendant's starting point of $52,063.48, however, it is by no means clear that the subsequent use of 16 pound machine inventory parts reduced the inventory on hand attributable only to the 46 machines deliverable prior to bankruptcy. Indeed, the logical inference is otherwise. Plaintiff was not required to, and presumably would not have disposed of parts purchased in pursuance of a contract subsequently breached before selling the remainder of its own inventory. Consequently, the amounts of inventory sold or used by the Trustee do not diminish the recoverable loss on the remainder of the inventory attributed herein to the 46 machines.

Moreover, even if as a matter of law defendant is accountable solely for the loss on inventory for 46 machines, the damages attributable to the element of loss on inventory come out substantially at the same figure.[2]

There remains for consideration the claim for damages in respect of the balance of the machines on order which were deliverable under the contract after the date of the bankruptcy; these totalled 110 units which were deliverable from May 21, 1963 at the rate of 15 machines per month.

█ The theory of the allowance of damages is to restore the injured party to the position he would have been in had the promisor performed. Therefore, even where a right of action for anticipatory breach of contract has arisen, the defendant may show that subsequent events would have rendered it impossible for the plaintiff to perform and would have justified termination by the defendant. See, 6 Williston on Con-

---

1. The uncontradicted testimony of the plaintiff was that there was a 15% salvage at auction sale of the inventory.

2. 46 machines used parts at cost of $52,-063.48. Alternatively, the total inventory cost of the Hoffman parts, $90,221.85, less the inventory sold or used, $37,-220.71, amounts to $53,001.24. On either assumption the mathematical result is substantially the same.

tracts (3rd Edition) § 884-5, pp 403-4; Rubinger v. Rippey, 201 Misc. 135, 110 N.Y.S.2d 5 (App.Term., 1st Dept. 1951).

Thus, a right of action for anticipatory breach of a contract is extinguished if it appears after the breach that there would have been a total failure to perform the return promise, even if the promisor has not justified his own breach. Restatement of Contracts § 277; 6 Williston on Contracts (3rd Edition) § 884-5.

In New York Trust Company v. Island Oil & Transport Corp., 34 F.2d 653, 654 (2d Cir. 1929), Judge Learned Hand considered the question of subsequent inability to perform by reason of insolvency after a breach by the solvent party. Judge Hand stated, in holding for the solvent party:

> "It is, indeed, one of the consequences of the doctrine of anticipatory breach that, if damages are assessed before the time of performance has expired, the court must take the chance of forecasting the future as best it can. That does not mean that it will ignore what has happened, when the period of performance has already expired. Damages never do more than restore the injured party to the position he would have been in, had the promisor performed * * * Hence, it is always an answer * * * to show that, had the contract continued, the promisee would not have been entitled to the performance, though he was apparently so entitled when the promisor disabled himself or repudiated."

Consequently, if the defendant can show by independent proof that the plaintiff could not or would not have performed after Glover became bankrupt, there can be no recovery of prospective profits by the plaintiff on machines deliverable after the date of the bankruptcy.

The mere insolvency of one of the parties to a contract, however, does not relieve the other party from performance thereof. Vandegrift v. Cowles Engineering Co., 161 N.Y. 435, 444, 55 N.E. 941, 48 L.R.A. 685 (1900).

It is the general rule that the appointment of a receiver in bankruptcy for a promisee does not excuse the promisor from performance of a contract and will not exonerate him from liability for failure to perform.

However, a seller's voluntary petition in bankruptcy may amount to an admission of disablement to perform his part of the contract.

Upon the trial, the plaintiff Trustee testified that he was forbidden by the bankruptcy court or its referee to accompany the sale of any machines with warranties. The contract between Glover and the defendant called for a one year warranty and this was an integral part of the consideration. The defendant would have been privileged not to accept tender of any machines under the contract which were not accompanied by a warranty. Consequently, as it turned out, the plaintiff could not have performed subsequent to May 21, 1963 and he was therefore not injured by the defendant's prospective refusal to accept the 110 machines deliverable during the period of the bankruptcy.

To summarize, the total damages to which plaintiff is entitled amount to $92,576 as of May 20, 1963. Defendant had on deposit with Glover the amount of $37,683, plus a credit of $440, or a total of $38,123.

The plaintiff is entitled to recover from the defendant over and above all counterclaims and setoffs due to defendant from plaintiff, the net amount of $54,453 together with interest thereon at six percent from May 20, 1963, and the costs of this action, for which he is hereby granted judgment.

The foregoing shall constitute the findings required by Rule 52(a), Fed.R. Civ.P.

So ordered.