**SCULLIN STEEL COMPANY,
Plaintiff-Appellant,**

v.

**PACCAR, INC., Defendant-Respondent.**

Nos. 49253, 49294.

Missouri Court of Appeals,
Eastern District,
Division Three.

April 1, 1986.

Motion for Rehearing and/or Transfer
Denied April 29, 1986.

Jim J. Shoemake, John William O'Neil, Michael B. Minton, Bruce Dayton Livingston, St. Louis, for plaintiff-appellant.

John P. Emde, St. Louis, for defendant-respondent.

KAROHL, Presiding Judge.

Defendant-buyer, PACCAR, Inc. (PACCAR), appeals judgment for plaintiff-seller, Scullin Steel Company (Scullin), in action for breach of written contract. In a jury-waived case, the trial entered judgment for Scullin, and awarded damages measured by loss of net profits and overhead together with prejudgment interest from the date of breach on the loss of net profits only. The court made extensive findings of fact and conclusions of law. The trial court responded to PACCAR's motion for new trial or in the alternative to alter, amend or vacate the judgment by reducing both the amount of the judgment and the derivative amount for prejudgment interest because it recognized a mechanical error regarding the calculation of the original judgment. Plaintiff cross-appeals claiming error in the failure of the court to award prejudgment interest on the basis of the loss of gross profits. A second count in the petition alleging prima facie tort resulted in a judgment for PACCAR and that judgment was not appealed.

The contract was for the sale of steel castings known as side frames and bolsters. Four side frames and two bolsters constitute one basic "car set" which is the recognized unit for the sale of such castings. Car sets are a structural part used in the manufacture of railroad cars. The sales agreement was executed by the parties on June 15, 1978. Pacific Car and Foundry Company (PACCAR) agreed to

buy 2,700 car sets during the period January 1, 1979 and ending December 31, 1981 at the rate of seventy-five car sets per month.[1] Other terms relevant to the agreement include the following:

2) Terms: Payment of full amount of each invoice is to be made in cash, ten days from the date of the invoice.

3) Price: Scullin's base price in effect on date of shipment, which shall not exceed by more than 10% the highest base price charged at any time during the period from the date of execution hereof to the date of shipment for side frames and bolster castings (exclusive of any and all extra charges pertaining to side frames and bolsters) by American Steel Foundries, Dresser Transportation Equipment Division, Dresser Industries, Inc., National Castings Division, Midland Ross Corporation, and Buckeye Steel Castings.

4) All prices may be subject to an additional charge for further increases in steel scrap and energy costs.

.    .    .    .    .

6) This agreement is not cancellable by either party.

Seller will use its best efforts to maintain the delivery rates set out above, but any deviations therefrom of any nature will be deemed not to substantially impair the value of the contract as a whole and will not constitute a breach of this contract.

In 1977, and prior, Scullin cast the frames and bolsters on order for its customers including PACCAR. The parties were aware the Scullin plant, located in St. Louis, Missouri, was in bad repair and inefficient. Scullin was a wholly owned subsidiary of Diversified Industries, Inc. (Diversified), a company listed on the New York Stock Exchange. The latter's management was at a crossroads requiring a decision to either accept an offer from National Castings Division, Midland Ross Corporation, and sell Scullin for $11,000,000 or to invest $9,000,000 to $10,000,000, or more, in the plant including buildings and equipment. It was thought that National Castings in due course would shut down the facility which would reduce the small number of car set manufacturers in the United States. This would expose the existing eighteen domestic rail car manufacturers, including PACCAR, to a less competitive market and potentially higher prices per car set in the future from the remaining domestic companies or foreign companies.

In 1978, Diversified devised a plan to offer and did offer almost identical three-year, non-cancellable contracts to the rail car manufacturers. The operative terms were identical. The only difference was in the number of car sets each manufacturer would contract to buy, and the corresponding number they were to order each month. There is no dispute that 1978 was a period of high demand and tight supply for car sets, and that circumstance was expected to last for the immediate future.

PACCAR attempted to negotiate some of the terms of the contract. It successfully reduced the number of car sets proposed by Scullin from 3,600 at 100 per month to 2,700 at 75 per month. However, PACCAR's additional efforts at "clarifications" were rejected. Specifically, a request to amend the contract by inserting a clause, "our commitment to purchase will be excused for any period where, for reasons beyond our control, our rail car manufacturing operation has ceased," was rejected. PACCAR's choice was to sign and become a contract customer or "throw the offer in a wastebasket." Only those rail car manufacturers willing to sign the agreement would receive car sets from Scullin. Twelve manufacturers, including PACCAR, accepted the contracts. Because of the guaranteed contracts Diversified obtained financing and made capital improvements by mid-1981 at a cost of more than $9,000,000.

---

**1.** The monthly quota was to be the average per month during the term of the contract rather than an exact number per month.

On April 3, 1979, only three months into the sales agreement, Scullin suggested various options to extend the term of the contract and increase the quantities to be purchased. Scullin agreed to meet the terms of the 1978 contracts but suggested that other rail car manufacturers were then ready and willing to commit themselves to a five-year contract immediately with the result that unless PACCAR extended the term of the contract it may be unable to purchase car sets from Scullin after the three year contract expired on December 31, 1981. On April 17, 1979, a written amendment to the sales agreement was agreed to by the parties. The amendment adopted all terms and conditions of the June 15, 1978 agreement, but extended the term for two years ending December 31, 1983. During the period of extension PACCAR agreed to purchase 1,008 car sets at the rate of 504 per year or 42 per month. Two additional customers signed sales agreements resulting in a total of fourteen.

The long term non-cancellable contract plan had obvious benefits for both Scullin and its customers. It assured Scullin sales over a fixed period and assured its customers of an additional domestic manufacturer as a hedge against reduced competition and higher prices from a lesser number of domestic manufacturers and foreign producers of car sets.

During the first two years of the contract, 1979 and 1980, PACCAR ordered the required 1800 car sets. Scullin encountered difficulties in meeting its customer commitments under the sales agreements. By the end of 1979, it was behind approximately 367 car sets, and by January 1980, 975 car sets. Scullin explained the delay in terms of strikes, mechanical breakdowns and equipment delays. In 1979, it produced an abundance of bolsters but was deficient in the production of matching side frames. In 1980, the production emphasis was on side frames. Accordingly, during the first six months of 1980, Scullin achieved a high level of sales and profits. This is significant because this period of profit was utilized by Scullin's accounting experts and by the court as a basis for determining lost profits for the remainder of the contract after PACCAR discontinued orders in 1981. Scullin did show a profit for the fiscal year 1979–1980. In 1980, it sold 9,581 car sets. Its costs were $36,618,582 or $3,822 per car set. Hence, 9581 × 4048 (least expensive price per car set) equals $38,783,888 less $36,618,582 or $2,165,306 pre-tax profit.

In November 1979, the sales price of car sets under the sales agreement reached its high mark. The list price of the least expensive car set became fixed at $4,048 per car set and thereafter remained at that level.

In 1980, disaster visited the rail car industry. The need of car sets evaporated. In January 1980, National Railway Utilization Corporation, one of the fourteen contract buyers, closed its plant and went into receivership. They were committed to purchase 6,362 car sets over a five-year period. United American Car, which was to buy 7,300 car sets over the five years, bought only 100 to 185 car sets and stopped all purchases. This trend applied equally to all customers. In response, on June 5, 1980, Scullin sent letters to seven of the existing thirteen customers who were substantially behind in their orders under the contracts, not including PACCAR which remained current. By November 1980, PACCAR had no new customer orders for railroad cars and advised Scullin of that fact. By January 1981, the industry collapsed. There were no orders for new railroad cars and no need for car sets. In February 1981, PACCAR notified Scullin that it would not buy any more car sets.

On April 13, 1981, Scullin reached a cash settlement with Bethlehem Steel Company and accepted $757 per car set on Bethlehem's then remaining commitment in full settlement. Two other buyers also settled for a cash payment. On April 15, 1981, Scullin notified PACCAR that it was in breach of the sales agreement, and offered a settlement on the same basis as was accepted by Bethlehem, if an agreement could be reached by April 20, 1981. PAC-

CAR requested additional time to review the entire matter, including the specifics of the Bethlehem settlement. During the next few weeks PACCAR investigated the possibility of purchasing Scullin's plant. That alternative was rejected on May 4, 1981 when PACCAR announced, by a telegram to Scullin, that it intended to take all reasonable steps to order side frames and bolsters from Scullin, that it was unable to do so at that time since there were no rail car orders; and, that it was concerned that if too many customers "buy out" Scullin would be unable to supply castings in the future.

We note that there was no evidence introduced to support a finding that on May 4, 1981, the accomplished buy-outs had destroyed Scullin's viability before PACCAR's breach. This suit was filed on May 5, 1981. The court concluded that by its acts PACCAR had breached and repudiated its contract with Scullin as of May 4, 1981.

On September 18, 1981, Scullin closed its plant and has been unable to produce any castings since that date. Scullin was able to make large reductions in its overhead, selling, general and administrative and corporate costs allocation and expenses both before and after the plant was closed. The total expenses for 1980 were $31,000,000, and for the first nine months of 1983, $600,000. Overhead expenses decreased from $23,161,000 in 1981 to $2,601,000 in 1982, and to approximately $800,000 in 1983. There is no dispute that PACCAR's remaining contractual commitment of 1,908 car sets was equal to 4.95% of Scullin's total remaining contractual expectancy from the fourteen customers who had signed long term contracts.

Scullin claimed that PACCAR's refusal to give assurances of future compliance with the sales agreement and amendment after the telegraphic request sent on April 15, 1981 was a repudiation of the sales agreement and amendment. § 400.2–609(1) RSMo 1978. The court so found. Accordingly, Scullin claimed lost profits it could reasonably expect to realize from the sale of castings not ordered by PACCAR

through the end of the term of the sales agreement and amendment, December 31, 1983. Plaintiff asked judgment for $4,586,-832. If this total was divided by 1,908 unpurchased car sets, the claim is for $2,404 per car set. The list price for the least expensive car set combination during the balance of the contract was $4,048 per car set.

Additional facts supported by evidence and found by the court will be noted throughout the opinion.

■■■ On these facts the court concluded that the contract between the parties was for the sale of goods and that PACCAR's failure to give adequate assurance of performance was a breach of the contract under § 400.2–609(1) RSMo 1978. PACCAR repudiated the contract with respect to performance not yet due. As a result, the value of the contract to Scullin was impaired and Scullin was entitled to resort to statutory remedies for breach, including breach of the whole contract. § 400.2–703 RSMo 1978. Scullin's damages for repudiation were the unpaid contract price together with any incidental damages but less expenses saved in consequence of the buyer's breach. § 400.2–708(1) RSMo 1978. However, if this measure of damages is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit, including reasonable overhead, which the seller would have made from full performance by the buyer. § 400.2–708(2) RSMo 1978. Scullin had the duty to prove the existence and amount of damages with reasonable certainty but not with absolute certainty. *Haggard v. Mid-States Metal Lines, Inc.*, 591 S.W.2d 71, 77 (Mo.App.1979). Where the damages are in the nature of lost profits, "All that can be required is to produce all the relevant facts tending to show the extent of damage and one is not to be excused for a breach of contract resulting in damages simply because those damages may not be established with exact certainty." *Hargis v. Sample*, 306 S.W.2d 564, 569 (Mo.1957). The loss of prospective profits must be

supported by the best evidence available. *Id.* The court concluded that Scullin established with certainty that some damage resulted from the anticipatory breach of the entire contract when repudiated by PACCAR. We agree. In the last full fiscal year of the contract before the market collapsed, Scullin made a pre-tax profit. It is reasonable to assume that the sale price to PACCAR per car set exceeded the cost per car set. We are not unmindful of PACCAR's argument that Scullin's production costs during the last three years of the PACCAR contract would reduce the level of profit because the contract price was fixed but Scullin had entered into a new labor contract for that three year period which would increase its production costs and decrease the amount of recoverable lost profit. This, however, does not destroy the trial court's conclusion that some damages occurred by reason of repudiation.

We first dispose of PACCAR's first claim of error that the breach by repudiation was excusable as a matter of law under the doctrine of frustration of purpose. This doctrine is recognized in the Restatement (Second) of Contracts, Chapter 11, § 265 (1981) and has been applied in Missouri. *Howard v. Nicholson,* 556 S.W.2d 477 (Mo.App.1977). It holds that where a party's principle purpose is frustrated without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate to the contrary. We find that both the language and the circumstances of the present contract indicate to the contrary. Scullin entered into the long term contracts for a known purpose, the rehabilitation of its plant and to continue as a producer of car sets. PACCAR was aware that a substantial new investment in the plant by Scullin was necessary and that the program would only go forward if non-cancellable long term contracts were available. PACCAR attempted to avoid the consequences of the non-cancellable requirement

and elected to proceed with that provision in the contract. It may be that no one anticipated a total stoppage of the requirement of railroad cars which occurred three years into the agreement but the possibility was foreseen and the buyers, including PACCAR, assumed that risk at the same time Scullin assumed the obligation of rehabilitating its facilities.

We have previously considered and rejected PACCAR's argument that Scullin failed to prove it was damaged by repudiation. However, this does not dispose of the detailed arguments that the court erred in the determination of damages. It is PACCAR's position that Scullin is not entitled to any damages after September 18, 1981, the date Scullin closed its plant, because Scullin thereafter was unable to perform its obligations under the sale contract. PACCAR also contends that the evidence of damages presented by accountants on behalf of Scullin was insufficient because the trial court found their theories and opinions not credible, and because the court utilized its own methodology, independent of the evidence in determining the extent of damages. PACCAR contends that the court failed to deduct all costs in arriving at net profits, failed to account for increases in Scullin's cost of performance over the life of the contract, relied upon Scullin's 1980 profits even though that period was not typical, and, used figures from Scullin's financial records to calculate its "overhead" without determining that they were "reasonable overhead" as required by § 400.2-708(2) RSMo 1978.

We first consider the contention that Scullin's damages are limited to those incurred between the date of breach by repudiation, May 4, 1981, and September 18, 1981, the date Scullin closed its manufacturing facility. PACCAR relies upon Restatement (Second) of Contracts, Chapter 10, § 244 (1981) which recognizes:

A party's duty to pay damages for total breach by non-performance is discharged if it appears after the breach that there would have been a total failure by the

injured party to perform his return promise.

The Restatement notes an illustration of this principle wherein the buyer contracts to make payment for a purchase, fails to timely make payment, but after that date and before the due date of delivery of the purchased machine it is accidentally destroyed. In that event, the buyer's duty to pay damages is discharged. PACCAR recognizes that § 254 of the same Restatement applies the same rule in a case of total repudiation. This principle was applied in *Hodes v. Hoffman International Corp.*, 280 F.Supp. 252 (S.D.N.Y.1968) and *Quivirian Development Co. v. Poteet*, 268 F.2d 433 (8th Cir.1959) (applying Missouri law).

In applying the principle of excuse after breach, PACCAR relies on evidence that Scullin's "break-even point" was approximately 600–625 car sets per month. The break-even point was the level of sales needed to avoid net losses. The three customers under the long term contracts who were not in breach at the time of PACCAR's breach were obligated to purchase only 120 car sets per month. As a result of the insolvency of one customer, and the breach by ten customers, including PACCAR, Scullin could not have continued to produce car sets at a profit. PACCAR also contends that the regulating association, American Association of Railroads, notified Scullin in September 1981 that it must show cause why its status as an approved foundry should not be revoked due to the poor quality of its car sets. PACCAR concludes that damages, if any, were limited to the period of May 4 through September 18, 1981.

■ We find PACCAR's position not fully supported by the facts and not applicable as a matter of law to the present facts. Reference to the request of the American Association of Railroads does not constitute proof that in any event Scullin would have been closed by the withdrawal of official recognition. Although the recognition may have been important to the purchasers of railroad cars, and they may have excluded Scullin as a manufacturer of the car set parts, the evidence does not extend to an actual de-recognition. All that was proven in this regard is the possibility of de-recognition. We also conclude that the excuse principle recognized by the Restatement and the cases cited is not applicable on the present facts where the repudiation breach by ten contract customers, including PACCAR, was the direct cause of the plant closing. This scenario is different than one in which the plant was closed for unrelated reasons, such as, fire destroying the plant. In the *Hodes* case, plaintiff filed bankruptcy four months after breach, and the court recognized that defendant's breach contributed in some part to the ultimate bankruptcy but nevertheless held that the bankruptcy extinguished plaintiff's right to damages. *Hodes* recognized the principle that the promisee (Scullin) is not entitled to be placed in a better position than he would have been if the promisor (PACCAR) fully performed. The distinction between *Hodes* and this case is that in the present case the evidence supports the conclusion that the repudiation directly caused the breach. At the time the contracts were negotiated there were only eighteen customers producing railroad cars, fourteen of whom signed contracts. Scullin was in a real sense held captive by these fourteen customers and when ten no longer had need of car sets and repudiated the result was that the plant had to be closed. The closing of the plant was consistent with Scullin's duty to mitigate damages. If the plant had remained open the resulting expenses would not have been "reasonable" and would not have been recoverable on that account under § 400.2–708(2). Here the breach caused the closing but in *Hodes* the breach contributed to but did not cause the bankruptcy. The facts in *Quivirian Development Co.*, are also distinguishable and do not support the conclusion that excuse from "supervening impossibility" directly caused by repudiation of an installment contract should be recognized. In *Quivirian*, the plaintiff contracted to purchase real estate from a defendant who could not deliver good title because part of the prop-

erty to be sold had been conveyed to others. The vendor claimed breach for failure to close and the purchaser claimed breach for failure to perfect the title. The district judge permitted the case to go to the jury on the question of whether the buyer had waived the title defects, and if so, was not entitled to recover a $10,000 deposit. The court held this to be error as a matter of law because on the evidence the vendor could not perform on the contract and was not entitled to damages on that account. On these facts, the inability to perform by the vendor was on his own account, and not caused by any breach by the buyer. We recognize the validity of the rule stated in § 244 of the Restatement of Contracts but hold that it is not applicable to the present facts. Accordingly, Scullin's damages were not foreclosed on September 18, 1981 when it closed its plant. PACCAR's breach was a direct cause of the closing.

In order to describe and discuss the remaining claims of error on PACCAR's appeal, we first consider the judgment and the reasoning of the trial court in relation to the determination and award of damages. The trial court followed a procedure not suggested by plaintiff's accountants. Defendant's accountants made no suggestion. Most of the testimony of PACCAR's accountants was a criticism of the procedure and conclusions of plaintiff's accountants. However, PACCAR's accountants concluded that the measure of damages would range from a savings of $300,000 to a loss of $300,000.

The trial court computed and awarded Scullin damages in two separate categories: (1) lost net profits in the amount of $431,208; (2) lost contribution to overhead in the amount of $1,091,860. The court also awarded prejudgment interest on the lost profits only in the amount of $122,894.

The computation of lost profits was based upon two agreed facts. First, the list price of the least expensive car set was established in 1979 and was fixed for the balance of the contract at $4,048. Second, the remaining car sets to be purchased by PACCAR but not ordered for the balance

of the contract were 1,908. From Scullin's records the court found that the average cost per car set during the last year of full operation, 1980, was $3,822. The court computed the lost net profits by subtracting $3,822 cost from $4,048 fixed contract price for the least expensive car set, and found a 1980 net profit per car set of $226.00. The court multiplied this sum times 1,908 non-purchased units, and arrived at a total of $431,208 lost net profits.

In order to arrive at the correct measure of damages under § 400.8–708(2), the court also determined overhead attributable to PACCAR. In order to compute this portion of the loss, the court referred to exhibits and found the actual overhead for Scullin for the fiscal years 1981, 1982 and 1983 to be $18,788,269, $2,293,474 and $976,044, respectively, for a total of $22,057,787. The court found that the remaining contractual commitment of PACCAR for 1,908 car sets amounted to 4.95% of the total number of car sets called for under the sales agreements during 1981–1983. It multiplied the total actual expenses by the percentage for a result of $1,091,860. The addition of lost profits on PACCAR's car sets and PACCAR's share of the overhead results in a product of $1,523,068. After an award of $122,894 in interest, the court rendered a judgment on Scullin's claim against PACCAR for $1,645,962.

We first dispose of PACCAR's reliance on the court's finding which discounted the probative effect of the opinions or conclusions of Scullin's experts. The trial court did not find their testimony unworthy of belief. It found that defendant's experts were more worthy of belief on the basis of their demeanor, background, experience and the substance of their work product. In a related finding, the court found that there was sufficient evidence of record to award Scullin more than nominal damages. This the court did in the manner above described. The court did not accept either the "actual cost approach" or the "incremental cost approach" advocated by plaintiff's accountants. Under the former, plaintiff's experts suggested damages of

$2,998,008, and under the latter, damages of $4,564,440. The problem the court found with both approaches was that during years of uninterrupted production Scullin did not reach profits (including reasonable overhead) of an amount approaching these estimates. The commercial code § 400.2–708(2) recognizes that the seller was entitled to be restored by an award of damages to a position as good as if there had been no breach but not to receive as damages any greater sum. Plaintiff seller is not entitled to be enriched by reason of the breach. Williston on Contracts (Third Addition 1968) § 1338; *Boten v. Brecklein,* 452 S.W.2d 86, 93 (Mo.1970). In principle, the methodology adopted by the trial court appears to comply with the measure of damages authorized in § 400.2–708(2) RSMo 1978.

However, we find that application of the trial court's methodology was defective and must reverse and remand for a new calculation. PACCAR correctly points to a number of defects in application.

First, the trial court relied upon the use of the average direct cost per car set in 1980, and used the figure of $3,822. One of the costs included in that figure was the cost of labor which was paid in 1980 according to rates then found in a union contract. There was no dispute that the contract had been renegotiated and the cost of labor increased for the period in which PACCAR failed to purchase 1,908 car sets. The trial court made no adjustment for this increased expense. Scullin argues that increased efficiencies would have caused an offsetting further adjustment. We have scoured the lengthy record and find no evidence to support such an offset. Even if there is such evidence, the adjustment for increased expenses not recoverable by an increase in the price of the least expensive car set under the contract renders the use of $3,822 average cost per car set as unsupported. As a result, the $226.00 figure for net profit per car set in 1980 is unreliable. It must be adjusted for the undisputed increase of direct production cost attributable to the increase in labor

costs and any other adjustments justified by the evidence.

We also find error in the use of the actual overhead figures for fiscal year 1981 in determining total actual costs subject to multiplication by PACCAR's percentage of responsibility. The fiscal year 1980–1981 for Scullin began on November 1, 1980 and concluded on October 31, 1981. During that period, some car sets were produced and sold to customers other than PACCAR. To the extent that the car sets produced and sold compensated for some of the overhead included in the $18,788,269 figure used by the trial court as 1981 overhead expenses the use of that figure allows Scullin a double recovery. We are aware that that figure was derived by the trial court in the amended judgment to begin on January 1, 1981, and to exclude the months of November and December of 1980 during the period PACCAR was in full compliance under the contract. However, that figure is not representative of overhead during a time when no car sets were produced and sold under all of the contracts. PACCAR agrees that after September 18, 1981, when the plant closed, and thereafter, the actual overhead was reasonable overhead within the meaning of the commercial code but correctly disputes the use of the figure used by the court for the period of January 1, 1981 through September 18, 1981.

■■■ Although the court did not expressly find the overhead portion of damages which it calculated was "reasonable overhead" as opposed to "overhead", we assume that was intended because Conclusion Eight (8) expressly notes that only "reasonable overhead" is allowable. Reasonable overhead has been interpreted to mean costs which are fixed and not those which are variable. *See Teradyne, Inc. v. Teledyne Industries, Inc.,* 676 F.2d 865, 869–870 (1st Cir.1982). It was incumbent on the trial court to scrutinize the actual overhead from January 1, 1981 through September 18, 1981 to determine and utilize only fixed expenses in calculating reasonable overhead. However, by using Scullin's unaudited statements of overhead,

which included many variable costs the trial court erred in including items not recognizable as reasonable overhead as defined by § 400.2–708(2) RSMo 1978. As a result, the court included items including depreciation, taxes and insurance. It also used a figure for "manufacturing materials" which may or may not have been proper in calculating reasonable overhead. Accordingly, on remand the court should reconsider the implementation of its calculation of overhead damages by adjusting the $18,788,269 actual overhead for the calendar year 1981 to arrive at a figure for reasonable overhead. In summary, the overhead figures in Scullin's financial records were apparently assumed to be "reasonable overhead." We do not find all the items in that category on Scullin were recoverable as damages in that category. To the extent that PACCAR attacks the records as unreliable because unaudited, we respond that that goes only to the weight of the evidence, and that was for the court.

The last point raised by PACCAR's appeal is the award of prejudgment interest. It contends that prejudgment interest was wholly unauthorized as a matter of law for lost profits in a breach of contract law suit. It also contends that the measure of damages was not readily ascertainable until determined by the court and should not have been awarded. Finally, it contends that the calculation of interest was erroneous because interest was awarded from the date of breach and treated all profits as if lost on May 4, 1981 which was not in accord with the contractual agreement.

The court awarded interest only on the lost profits component of damages because it determined that at the time of breach there was no standard by which to calculate the amount of overhead which would be spent over the remaining two and one-half years of the contract. The court recognized *Underwood Typewriter Co. v. Century Realty Co.*, 165 Mo.App. 131, 146 S.W. 448, 451 (1912), *citing, Wiggins Ferry Co. v. Chicago & Atlas Railroad*, 128 Mo. 224, 27 S.W. 568, 574 (1894). PACCAR argues that these cases stand for the proposition that when the only damages sued for are the loss of profits shown to have been available to plaintiff, had the contract not been breached, then interest is not recoverable.

As a general rule, interest is not allowable prior to judgment upon an unliquidated claim for the reason that where the person liable does not know the amount he owes, he should not be considered in default because of failure to pay. *Ohlendorf v. Feinstein*, 670 S.W.2d 930, 935 (Mo.App.1984). Interest has been allowed where the trial court found an amount was indisputably due under the contract. *Foley Co. v. Walnut Associates*, 597 S.W.2d 685, 691 (Mo.App.1980). In order to be liquidated as to bear interest a claim must be fixed and determined or readily determinable, but it is sufficient if it is ascertainable by computation or a recognized standard. *Komosa v. Monsanto Chemical Co.*, 317 S.W.2d 396, 400 (Mo. banc 1958). Although these general principles and others have been utilized to justify the award of prejudgment interest, the holding in *Wiggins* has never been directly overruled by the supreme court of this state where the suit for breach of contract sought as damages only lost profits. We are bound by the decision in *Wiggins* where the court said, "... we think it has not been the practice in the state, whatever it may be elsewhere, to allow interest on damages where the measure of damages is lost profits." 27 S.W. at 574. Mo. Const. Article V, § 2; *Keener v. Berry*, 442 S.W.2d 159, 162 (Mo.App.1969). Accordingly, the trial court erred in awarding prejudgment interest as a matter of law in the present law suit. In addition, we believe that the measure of damages were not readily ascertainable even with regard to the "lost profits" separately calculated by the trial court. For the reasons noted in this opinion, we believe that the measure of damages for breach of contract has not yet been ascertained because the components of the calculation remain to be isolated and determined. Accordingly, the award of prejudgment interest was improper under

*Wiggins* and the principles recognized in *Ohlendorf,* 670 S.W.2d at 935.[2]

Scullin's cross-appeal is based upon a claim that the court erred in awarding prejudgment interest only on net profits and not on the total damage award of gross profits. Section 400.2–708(2) RSMo 1978 provides that the measure of damage is "the profit (including reasonable overhead) which the seller would have made from full performance ..." It is unnecessary for us to determine this issue because we hold that on the facts of this case prejudgment interest was unauthorized on the entire judgment.

SIMON and GARY M. GAERTNER, JJ., concur.

**S.P.N., Appellant,**

v.

**M.W.N., Respondent.**

**Nos. 49890 and 49851.**

Missouri Court of Appeals,
Eastern District,
Division One.

April 8, 1986.

Joel W. Case, Manchester, for appellant.

Barry S. Ginsburg, Clayton, for respondent.

2. We also find that the award of interest from date of breach was in error because the contract called for monthly (or annual) performance and where interest is recoverable it may be allowed from the time performance was due. Restatement of Contracts (Second), Chapter 16, § 354, p. 150.