**SCULLIN STEEL COMPANY, Plaintiff–Appellant, Cross–Respondent,**

v.

**PACCAR, INC., Defendant–Respondent, Cross–Appellant.**

Nos. 52935, 52938.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 29, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied
May 6, 1988.

Jim J. Shoemake, John W. O'Neil, Jr., Michael B. Minton, Bruce D. Livingston, David W. Harlan, St. Louis, for plaintiff-appellant cross-respondent.

John P. Emde, Thomas E. Wack, Wilbur L. Tomlinson, St. Louis, for defendant-respondent, cross-appellant.

STEPHAN, Presiding Judge.

In *Scullin Steel Co. v. PACCAR, Inc.*, 708 S.W.2d 756 (Mo.App.1986), hereinafter *Scullin I*, we affirmed the circuit court's judgment that PACCAR, Inc. was liable to Scullin Steel Co. for breach of a long-term supply contract. We further determined that had it been correctly applied, the method the circuit court used to compute Scullin's damages would have yielded the lost net profit and reasonable overhead award authorized by § 400.2–708(2), RSMo. We found, however, that the circuit court had not correctly applied the method. Accordingly, we remanded the matter for a recalculation of the lost net profit and reasonable overhead elements of the damages award. Scullin appeals from the judgment as modified on remand. PACCAR cross-

appeals. We reverse in part, affirm in part, and remand.

## I

PACCAR, Inc. manufactures railroad cars. Until September 18, 1981, when it closed its plant, Scullin Steel Co. manufactured railroad car components called "carsets". In 1979, PACCAR contracted to purchase carsets from Scullin. Subsequently, PACCAR breached. The details of PACCAR's contract with Scullin are set out fully in *Scullin I*, 708 S.W.2d at 758–761, and need not be repeated here, inasmuch as the only question before us on this appeal is whether damages for the breach have been correctly calculated. Suffice it to say simply that in *Scullin I* we held that the contract the parties signed in 1979 obligated PACCAR to purchase 1,908 carsets from Scullin during 1981–1983 at a fixed price per carset of $4,048.00; that PACCAR breached this obligation; that, as a result, Scullin was, in accordance with § 400.2–708(2), RSMo, entitled to recover from PACCAR the net profit it would have realized if PACCAR had not breached, plus the reasonable overhead it would have satisfied from the contract proceeds; but that the circuit court had incorrectly calculated lost net profit and reasonable overhead.

## II

### *Lost Net Profit*

To arrive at lost net profit in the first instance, the circuit court subtracted $3,822.00, what it deemed to be Scullin's average cost per carset for 1981–1983, from $4,048.00, the fixed contract price per carset, and multiplied the difference by 1,908, the number of carsets PACCAR was contractually obligated to purchase during the 1981–1983 period. In *Scullin I*, we expressly approved the "average cost per carset" as a component of the lost net profit formula.[1] 708 S.W.2d at 764–765. We found, however, that $3,822.00 did not fairly approximate this cost for contract years 1981–1983. *Id.*

The flaw in the circuit court's calculation, as we saw it, was this: From Scullin's records, the circuit court had determined that $3,822.00 was the average cost per carset during 1980, the last full year of Scullin's operation. It then simply adopted $3,822.00 as the average cost per carset for contract years 1981–1983. One of the costs included in the $3,822.00 figure, however, was the cost of labor, which was paid in 1980 according to rates prescribed in a union contract. It was undisputed that this contract had been renegotiated for 1981–1983 and would have effected a marked increase in the cost of labor. Nevertheless, the circuit court failed to adjust the $3,822.00 figure to reflect this increased expense. Accordingly, in *Scullin I* we remanded, directing the trial court to account for the "undisputed increase of direct production cost attributable to the increase in labor costs" that Scullin would have realized during 1981–1983 if it had remained in business. *Id.*

On remand, the circuit court determined that Scullin's 1981 labor costs would have exceeded its 1980 labor costs by 5% if Scullin had remained in business. The court adjusted the 1981 average cost per carset accordingly, then subtracted that adjusted cost from the fixed contract price per carset to find that in 1981 Scullin would have

---

**1.** In the present appeal, Scullin argues that because PACCAR was only obligated to purchase "basic" carsets, lost net profit per carset is only correctly reflected by the difference between a basic carset's price and cost. "Average cost per carset" takes the cost of both "basic" carsets and carsets with "extras" into account. Thus, Scullin asserts that using "average cost per carset" to calculate lost net profit is error.

Scullin could have raised this issue on the first appeal. It did not. In *Scullin I*, we ap-

proved the average cost per carset as an element of lost net profit. We are not required to, nor will we, reconsider our position. *Jones v. Eagan*, 715 S.W.2d 596 (Mo.App.1986).

Similarly, we decline to consider Scullin's claim that the circuit court's failure to award Scullin "mitigation expenses" was error. This point was raised on the first appeal and rejected. It was not within the scope of the remand and is not cognizable at this point. See *State v. Rooney*, 402 S.W.2d 354, 361 (Mo. banc 1966).

realized $126.00 net profit on each carset it sold to PACCAR.

The circuit court then turned to consider what effect increased labor costs would have had on Scullin's profits in 1982 and 1983. In this regard, it stated:

> The Court has considered the effects of increased labor costs, increased efficiencies, changing material and energy prices, taxes, insurance, et al., and concludes that it is not possible to arrive at a precise measure of predicted costs and profits for 1982 and 1983. Therefore, the Court, based upon [Scullin's] avowed intentions of turning its operations into a profitable entity, will assume that adjustments in cost or price could have been made to retain a level of profits at $126 per carset.

The circuit court then multiplied $126.00 times 1,908, the number of carsets PACCAR was contractually obligated to purchase from Scullin during the 1981–1983 period. The product, $240,408.00, became the lost net profit award.

■ In its first point, Scullin asserts the record does not support the circuit court's determination that Scullin's 1981 labor costs would have exceeded its 1980 labor costs by 5%. Scullin is correct. No evidence of a 5% increase was adduced at trial. In a memorandum to the court on remand, Scullin did suggest that an "assumed" 5% increase in labor costs would

have been offset by increased productivity. A party's self-serving suggestion is not evidence, however, and though it might have risen to the dignity of a stipulation if PACCAR had accepted it, PACCAR did not.

To what evidence then were we referring when we directed the trial court to adjust the 1981–1983 average cost per carset to reflect "the undisputed increase of direct production cost attributable to the increase in labor costs"? Plainly, it was the unchallenged testimony of William F. Golus, a Scullin consultant who served as the company's vice president of manufacturing when the union contract was negotiated for the period 1981–1983.

Golus's testimony establishes that if Scullin had remained in business after 1980, the renegotiated labor contract would have effected a 10 million dollar increase in the cost of labor over the 1981–1983 period, that at least one-third of that increase would have been realized in 1981, and that, therefore, the cost of labor in 1981 alone would have exceeded the cost of labor in 1980 by at least 67%. When the average cost per carset is adjusted to reflect this 67% increase,[2] it exceeds $4,048.00, the fixed contract price per carset. We therefore conclude Scullin would have realized no net profit on the sale of carsets to PACCAR after 1980.[3]

■ Scullin argues, as it did in *Scullin I*, that "increased efficiencies" would have

**2.** As we have stated, the trial court determined that the average cost per carset in 1980 was $3,822.00. To arrive at this figure, the court divided Scullin's total costs for 1980 ($36,619,-229.00) by the number of carsets Scullin produced during that period (9,581). The 1980 total costs figure included a direct labor cost of $4,906,356.00. Golus' testimony establishes that this direct labor cost would have increased by at least 67% (or by at least one-third of 10 million dollars) in 1981. When this increase is taken into account, the total costs figure for 1981 becomes roughly $39,952,562.00, which when divided by 9,581, the number of carsets Scullin was expected to produce in 1981, yields a 1981 average cost per carset of roughly $4,170.00.

**3.** It is the dissent's position that contrary to Golus' testimony, "... the new labor contract became effective in 1980 and the sharpest increase in the labor contract (seventy-five cents

per hour) was experienced that year and was included in the trial court's original net profit projection." The labor contract, however, was never properly admitted into evidence. Scullin merely appended it to a memorandum it submitted to the trial court on remand. It is not properly before this court. Neither is there any indication in the record that the trial court took it into account when it fashioned its original net profit award or the net profit award on remand. Because the labor contract is not before us, Golus' testimony remains unimpeached.

Moreover, even if the labor contract were in evidence, and we were to accept the dissent's position that the "steepest percentage of the labor cost increase" was realized in 1980, and that the trial court took this into account when it calculated Scullin's net profit for 1980, by our calculations the labor cost increase to be realized in the years following 1980 could have

offset any increased labor costs. We find no evidence in the record to support this claim, nor can we sustain a finding of increased efficiencies on Scullin's "avowed intentions of turning its operations into a profitable entity". The judgment insofar as it awards Scullin lost net profit accordingly is reversed.

## III

### *Reasonable Overhead*

■ In *Scullin I*, we determined that in addition to lost net profit, Scullin was entitled to recover as damages from PACCAR the "fixed" costs, or "reasonable overhead", it would have satisfied out of the proceeds of the breached contract.[4] We also found, however, that in calculating reasonable overhead for the period January 1, 1981 through September 18, 1981, the circuit court had erroneously credited Scullin with certain "variable" costs, or costs that were directly affected by rises and falls in Scullin's productivity. Accordingly, we remanded with directions that only fixed costs be considered in calculating an award of reasonable overhead. 708 S.W.2d at 765–766.

On remand, the circuit court determined that for the six month period ending June 30, 1980, Scullin's fixed costs[5] represented 30% of Scullin's total costs for the period. Implicitly adopting this percentage as a reasonable estimate of the ratio of fixed costs to total costs for the period January 1, 1981–September 30, 1981, the circuit court then determined that Scullin's fixed costs for January 1, 1981–September 30, 1981 were $6,884,000.00, or 30% of $22,945,000.00, Scullin's total costs for the period. This fixed costs figure was then added to the fixed costs Scullin indisputably in-

curred from October 1, 1981–December 31, 1983. When the sum of these fixed costs was then multiplied by 4.95%, earlier determined to be the percentage of Scullin's total overhead that would have been satisfied from the proceeds of the PACCAR contract,[6] it yielded a product of $537,125.00, which became the "reasonable overhead" award.

We find no fault with the formula the circuit court used to calculate an award of reasonable overhead. In a contract action, damages need not be proved to a certainty. Evidence that enables the trier of fact to make as intelligent an estimate as the circumstances of the case will allow is sufficient. See *Morris v. Perkins Chevrolet, Inc.*, 663 S.W.2d 785, 787–788 (Mo.App. 1984). PACCAR, in its cross-appeal, however, apparently asserts the 30% figure the circuit court used to determine Scullin's fixed costs for January 1981–September 1981 was inflated. We are unconvinced.

To arrive at the 30% figure, the circuit court divided $5,827,000.00, what it deemed to be Scullin's fixed costs for the six month period ending June 30, 1980, by $19,403,000.00, Scullin's total costs for the same period. PACCAR's position, as we understand it, is that the percentage thus derived is inflated because the fixed costs figure in fact includes costs that are "variable", or somehow a function of Scullin's productivity. Whether a cost is fixed or variable, or whether a cost is directly affected by fluctuations in productivity, however, is a question of fact, and the circuit court's finding with respect thereto is entitled to deference unless there is no evidence to support it. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

The circuit court has determined that the payroll, salaries, taxes, utilities, rent and

---

caused the average cost per carset to exceed the contract price per carset in those years.

**4.** Fixed costs, which § 400.2–708(2) denominates "reasonable overhead", commonly include property taxes, salaries, rent, utilities, depreciation, insurance, and other costs not directly affected by fluctuations in productivity. *J.*

*White & R. Summers, Uniform Commercial Code,* § 7–13, p. 235 (1972).

**5.** Denominated "Indirect Production Costs" in Scullin's exhibits.

**6.** 708 S.W.2d at 764.

depreciation costs represented by the $5,827,000.00 figure are costs Scullin would have incurred during the six month period ending June 30, 1980 regardless of how many carsets it produced. Nothing in the record and nothing PACCAR raises in its cross-appeal persuades us the circuit court has erred. Costs not directly affected by fluctuations in productivity are, by definition, "fixed" costs. *J. White & R. Summers, Uniform Commercial Code*, supra, § 7–13, p. 235 (1972). The point is denied. The circuit court's award of $537,125.00 "reasonable overhead" is affirmed.

## IV

■ Section 512.160(4), RSMo, provides that when a judgment is affirmed "for part of the sum of which judgment was rendered by the trial court, such part of said judgment shall bear lawful interest from the date of the rendition of the original judgment in the trial court". On July 6, 1984, the trial court awarded Scullin Steel $1,091,860.00 as reasonable overhead. With this opinion, we affirm $537,125.00 of that judgment. In accordance with § 512.160(4), the latter amount shall bear lawful interest from July 6, 1984, the date of the original judgment.

The judgment insofar as it awards Scullin Steel lost net profit is reversed. The judgment insofar as it awards Scullin Steel $537,125.00 as reasonable overhead is affirmed. The matter is remanded with directions to award Scullin Steel interest on the overhead award in accordance with § 512.160(4), RSMo.

So ordered.

PUDLOWSKI, J., concurs.

DOWD, J., dissents in separate opinion.

DOWD, Judge, dissenting.

I respectfully dissent.

I disagree with that portion of the majority opinion eliminating Scullin Steel's lost profit award. Due to the reliance by this court in *Scullin* I on an erroneous statement in the record, subsequently corrected on remand, I would reinstate the trial court's original award of lost profits in the amount of $431,208.00.

In *Scullin* I, 708 S.W.2d 756 (Mo.App. 1986), this court remanded in part for a recalculation of lost profits based on evidence in the record of an increase in labor costs for the remaining years of the sales contract. In the original proceeding, the trial court projected lost profits for the term of the sales contract based on direct cost figures for 1980, which included the cost of labor in 1980. Due to evidence in the record that the labor contract was renegotiated for the period 1981–83, we concluded in *Scullin* I that the direct cost figure should be adjusted to reflect the increased cost of labor. *Id.* at 765.

The evidence of an increase in labor costs was provided by the deposition testimony of William F. Golus, who had served as Scullin's Vice President of Manufacturing when the union labor contract was negotiated. In the deposition testimony offered by PACCAR, Golus stated he "believed" the new labor contract took effect in 1981 and that the new contract would have resulted in a $10,000,000.00 increase in labor costs from 1981–83. It was Golus' testimony that the new labor contract provided for an increase of seventy-five cents per hour in direct labor the first year of the contract, an increase of forty-five cents per hour the second year, and an increase of twenty-five cents per hour in the third year.

In actuality, however, the new labor contract became effective in 1980 and the sharpest increase in the labor contract (seventy-five cents per hour) was experienced that year and was included in the trial court's original net profit projection. A copy of the new labor contract was appended to Scullin's Memorandum Suggesting a Proposed Recalculation of Damages in Accordance With the Opinion of the Missouri Court of Appeals. The labor contract

showed the seventy-five cents per hour increase was effective March 9, 1980.

Scullin filed its memorandum with the appended labor contract pursuant to the trial court's order on remand requiring the parties to file memoranda of law and to brief the issue of whether further evidence should be allowed in the cause. Both sides submitted documentary evidence not included in the original proceeding. In its Motion to Amend the Order Amending Judgment on Remand, PACCAR included a copy of the 1977 labor contract and a certified copy of the Consumer Price Index. It was in the sound discretion of the trial court to allow the labor contract in the cause in order to show the exact facts and the court properly considered that evidence in determining lost profits. *See, Matter of Estate of Viviano,* 624 S.W.2d 130, 133 (Mo.App.1981) (whether to allow a party to present further evidence after the evidence is closed is a matter of trial court discretion and failure to allow the introduction of material evidence which might substantially affect the merits of the case would be an abuse of discretion).

In a well-intentioned attempt to comply with the opinion of this court in *Scullin* I and at the same time to effect a decision fair to both parties, the trial court on remand adopted an apparent compromise between the parties, suggested in their memoranda, of a five percent increase in labor costs in 1981. The court then projected lost profits for the remainder of the contract term based on the 1981 figure for direct costs concluding that it was not possible to arrive at a precise measure of predicted costs and profits for 1982 and 1983. The court assumed that adjustments in cost or price would have been made to retain the 1981 level of profits and awarded lost profits in the amount of $240,408.00.

Considering the factual change on remand, the trial court should not have regarded itself bound by our prior decision directing an adjustment in the direct cost figure to reflect an increase in labor costs. We remanded for a recalculation of damages and authorized the trial court to make "adjustments justified by the evidence." *Scullin* I, *supra,* at 765. Further, a previous holding by the court of appeals does not conclude an issue on remand where there is a change in the evidence. *Gamble v. Hoffman,* 732 S.W.2d 890, 895 (Mo. banc 1987). The actual effective date of the labor contract amounted to a crucial change in the evidence.

In light of the effective date of the labor contract, the original lost profit award of $431,208.00 should have been reinstated. According to PACCAR's own expert, Scullin achieved a 1980 operating profit of $2,700,000.00. The actual effective date of the labor contract shows Scullin was able to achieve this profit despite absorbing the steepest percentage of the labor cost increase. This fact fortifies Scullin's position that labor costs were offset by increased efficiencies. Direct costs should have been determined by the 1980 figures and the trial court's acceptance of Scullin's offsetting efficiencies argument, in calculating net profits for 1982 and 1983, should have been extended to offset any increase in Scullin's labor costs in 1981.

For the foregoing reasons, I respectfully dissent.