CARPENTER–VULQUARTZ REDEVEL-
OPMENT CORPORATION and Al-
lan R. Carpenter, Respondents,

v.

JAMES H. BARICKMAN ASSOCIATES,
and James H. Barickman,
Appellants.

No. WD 47647.

Missouri Court of Appeals,
Western District.

Aug. 2, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 4, 1994.

Application to Transfer Denied
Nov. 22, 1994.

Frank P. Sebree, Joseph S. Gall, Kansas City, for respondents.

Paul Schepers, Charles A. Blackmar, Kansas City, for appellants.

Before ULRICH, P.J., and BRECKENRIDGE and SPINDEN, JJ.

SPINDEN, Judge.

Carpenter–Vulquartz Redevelopment Corporation bought an office building from James Barickman Associates.[1] About three years later, the building's largest occupant quit paying rent. Carpenter sued Barickman for indemnification of Carpenter's expenses in enforcing the lease.

The trial court ordered Barickman to indemnify Carpenter for over $150,000 in expenses and attorney fees Carpenter accrued in suing the wayward tenant. Barickman appeals. We reverse the trial court's judgment.

---

1. For the reader's ease in an already confusing case, we refer to Carpenter–Vulquartz as Carpen-
ter, and to James Barickman and Barickman Associates as Barickman.

Barickman agreed to indemnify Carpenter for any losses or expenses arising out of the failure of the building's primary occupant to execute an estoppel certificate. Carpenter had insisted on an estoppel certificate because it worried that the building's tenants might challenge their leases' validity.

The estoppel certificate which Carpenter wanted the tenants to execute sought these representations:

The undersigned hereby certifies that:

(1) I am the tenant and present occupant of [the premises] which constitutes a portion of the property ("the building") located at 427 West 12th Street, Kansas City, Missouri.

(2) The premises are leased under a least [sic] dated as of _____, 19__. A copy of the lease and all amendments (collectively called "the lease") are attached. The lease contains all of the agreements between me and the landlord.

. . . .

(8) No person or firm other than myself is in possession and to the best of my knowledge no other person or firm other than the landlord has a future right to the premises. (If anyone else has such rights, state name, address, and explain such rights.)

(9) I have not assigned or entered into any subleases of the lease, except as follows:

_____

. . . .

(12) I have been advised that the landlord is selling the building to Carpenter–Vulquartz Redevelopment Corporation (the "purchaser"). After receipt of notice from the landlord that the sale has been completed, I will honor the assignment of the landlord's interest in the lease to said purchaser.

About 60 percent of the building's space was tied to one lease in which Barickman Advertising was identified as the lessee. Barickman Advertising did not occupy the leased space. It was occupied by Fletcher/Mayo/Associates, Inc., a wholly-owned

subsidiary of Doyle Dane Bernbach International, Inc. Although Fletcher/Mayo did not have a direct relation to Barickman Advertising, both were members of a large family of corporations parented by Doyle Dane Bernbach International. The record is silent concerning Fletcher/Mayo's right to occupy the space, although Fletcher/Mayo paid the rent and otherwise acted as tenant—it even referred to itself as the tenant.[2]

Carpenter knew that Fletcher/Mayo, not Barickman Advertising, occupied the space. We find nothing in the record indicating that Carpenter inquired as to why Fletcher/Mayo occupied the space rather than Barickman Advertising. Although it knew that the occupant was doing business as Fletcher/Mayo, Carpenter seemed appeased by Fletcher/Mayo's holding itself out in telephone directories and elsewhere as a Doyle Dane Bernbach company. Carpenter's primary concern was keeping a company associated with Doyle Dane Bernbach on its premises. It did not seem to care whether Barickman Advertising was the specific Doyle Dane Bernbach company occupying the space.

All went well until 1986. On January 6, 1986, Fletcher/Mayo wrote Carpenter: "We are your tenant at 427 West 12th Street, Kansas City, MO and are about to put the space out for sublet as we no longer can use it. As a courtesy to you as the owner, we wanted you to know in case you have any use for it yourself." Later, in 1986, Fletcher/Mayo moved out of the building, leaving some furnishings behind. It continued paying rent.

On December 22, 1986, Esrey Company sent Carpenter a telex message: "We have been authorized by client Fletcher Mayo Kansas City to make final offer $450,000 as payment in full to release from their lease obligation in building 427 West 12th Kansas City Mo." Carpenter rejected the offer. Fletcher/Mayo continued paying rent, but its payments for January and February 1987 were late. Fletcher/Mayo stopped paying rent entirely in October 1987.

2. We must presume that Doyle Dane Bernbach Advertising did not convey its interest to Fletcher/Mayo because when Carpenter sued Fletcher/Mayo for unpaid rent, Doyle Dane Bernbach Advertising's successor assumed full responsibility for the lease obligation.

Carpenter responded by sending several letters to Fletcher/Mayo and to a firm in New York, DDB Needham Worldwide,[3] demanding payment and announcing that it was exercising its option to terminate the lease. Ford Nelson, a Kansas City attorney, responded to the letters. He told Carpenter's lawyer that he would determine whether Fletcher/Mayo had relinquished possession of the premises. Carpenter did not hear again from Nelson or anyone else representing Fletcher/Mayo or any company affiliated with Doyle Dane Bernbach. Carpenter decided to sue for unpaid rent and possession of the premises.

In preparing for the suit, Carpenter's attorneys tried to trace Barickman Advertising, the firm named in the lease as the lessee. Its attorney telephoned the Missouri Secretary of State's office. A staffer told the attorney that Barickman Advertising had reorganized as Doyle Dane Bernbach Advertising, Inc., but that Doyle Dane Bernbach Advertising, Inc. had merged out of state. The attorney did not request to see any documents on file with the Secretary of State's office and wrongly concluded that no successor to Barickman Advertising existed. Documents on file with the Secretary of State's office reported that Doyle Dane Bernbach Advertising, Inc., originally Barickman & Selders Advertising, Inc., was incorporated under the laws of Missouri on July 7, 1966; that Barickman & Selders Advertising, Inc. changed its name to Barickman Advertising, Inc. on August 20, 1970; that Barickman Advertising, Inc. merged with Bernard Hodes Advertising, Inc. on August 31, 1981, and Barickman Advertising, Inc. was the surviving corporation; that Barickman Advertising, Inc. changed its name to Doyle Dane Bernbach Advertising, Inc. on August 31, 1981; that Doyle Dane Bernbach Advertising, Inc. merged into BA Subsidiary, Inc., a Delaware corporation, on October 31, 1981, with BA Subsidiary, Inc. surviving. Documents on file in the Delaware Secretary of State's office reported that BA Subsidiary, Inc. changed its name to Doyle Dane Bernbach Advertising, Inc., which later changed its name to Bernard Hodes Advertising, Inc. Instead of pursuing documents on file with the Secretary of State's office, Carpenter's attorneys relied on telephone directory listings, a newspaper article, and a document filed with the Securities and Exchange Commission to determine who to name as defendants.

On March 9, 1988, Carpenter sued Fletcher/Mayo and Doyle Dane Bernbach Advertising. It also named as defendants DDB Needham Worldwide, Inc. and Omnicom Group, Inc.[4] The defendants filed a joint answer generally denying all allegations. We refer to this suit as the rent and possession case.[5]

During discovery in the rent and possession case, Carpenter learned that Bernard Hodes Advertising was a successor to Doyle Dane Bernbach Advertising. On June 7, 1989, Carpenter amended its petition to include Bernard Hodes Advertising as a defendant. Bernard Hodes Advertising answered in September 1989 by admitting that it "succeeded to the rights and assumed the obligations of Barickman Advertising, Inc. under the lease dated April 1, 1981[.]" After this admission, the defendants settled the lawsuit by paying Carpenter $700,000.

Carpenter then filed this lawsuit, seeking reimbursement for its expenses, including attorney fees, growing out of the first suit. Carpenter also accused Barickman of fraud. It asserted that Barickman intended to mislead it with confusing documents and by misinforming it of the building's true owner. The trial court found for Carpenter on all

---

3. This was one of the corporations in the Doyle Dane Bernbach International family which Carpenter found mentioned in a 1986 newspaper article. Carpenter addressed the letters to "Fletcher/Mayo/Associates, Inc. Division of Doyle Dane Bernbach Advertising, Inc. (DDB Needham Worldwide)."

4. Doyle Dane Bernbach International, Inc. renamed itself Doyle Dane Bernbach Group, Inc.

in 1985. The next year, it renamed itself Omnicom Group, Inc.

5. This court heard an appeal of the rent and possession case before it was settled. See *Carpenter–Vulquartz Redevelopment Corporation v. Doyle Dane Bernbach Advertising, Inc.*, 777 S.W.2d 305 (Mo.App.1989).

counts and ordered Barickman to pay damages of $49,598.86 and attorney fees of $100,756.86.

### Breach of Indemnity Agreement

■ Barickman complains that the trial court erred in holding him liable under the indemnity agreement for expenses and losses incurred by Carpenter in pursuing the rent and possession case. He claims that substantial evidence does not support the trial court's finding that the lack of a tenant estoppel certificate caused those losses.

The indemnity contract said:

[Barickman] hereby agrees to indemnify and hold harmless [Carpenter] from and against any and all losses, liabilities and expenses (*including reasonable attorney's fees*) incurred by [Carpenter] ... as a result of or arising out of or relating to the failure or refusal of any of said lessees to execute a tenant estoppel certificate requested by [Carpenter].

Carpenter apparently deemed this agreement to be Barickman's suretyship of Doyle Dane Bernbach Advertising's performance under the lease. In a letter to Barickman dated June 18, 1988, Carpenter said, "At the time we purchased [427 West 12th Street Building] you furnished us with an indemnity against default by the lessee, in lieu of the normal estoppel agreement." On June 27, 1988, Carpenter again wrote Barickman opining that it "believe[d] that you should be indemnifying us for our losses (defaulted rent, attorneys fees, litigation costs, etc.)[.]"

The agreement was not a suretyship guaranteeing tenant performance. The agreement would have been a suretyship only had Barickman expressly promised to fulfill the tenant's obligation to Carpenter upon the tenant's default. *City of Kansas City ex rel. Jennings v. Integon Indemnity Corporation*, 857 S.W.2d 233, 236 (Mo.App.1993). Had the agreement been a suretyship, Barickman Associates would have been as responsible for the lease obligation as was Doyle Dane Bernbach Advertising. It was not.

Instead, Barickman's agreement constituted a contract of indemnity against loss as specified in the contract: those "relating to the failure or refusal of [Doyle Dane Bernbach Advertising] to execute a tenant estoppel certificate[.]" It was an agreement that Barickman would reimburse Carpenter in the event that Carpenter suffered losses, liabilities or expenses as a result of not having an estoppel certificate—not as a result of a tenant's defaulting on rent payments.

As Barickman tried to inform Carpenter in a letter dated July 5, 1989, "My guarantee concerned the validity of the lease and not [the tenant's] ability to pay." Had Carpenter obtained an estoppel certificate, it would not have assured Carpenter that the tenant would not default. It asked the tenant only for a representation that it would "honor the *assignment* of [Barickman's] interest in the lease to [Carpenter]." [6] The tenant did honor the assignment and continued paying rent for almost three years after the assignment. As late as December 22, 1986, Fletcher/Mayo was endeavoring to negotiate payment and release "from their lease obligation."

Carpenter emphasizes that a significant portion of the expenses for which it seeks recovery resulted from the vigor with which the *defendants* in the rent and possession case defended the suit. It complains, for example, about the defendants' lack of cooperation in discovery and their refusal to admit liability. The trial court made no finding concerning this contention. The court rested Barickman's liability on this finding:

The prosecution of the Rent and Possession Case was made difficult because plaintiffs did not have a tenant estoppel certificate identifying Doyle Dane Bernbach Advertising, Inc., a Delaware corporation, as the entity legally responsible on the Doyle Dane Lease.

We fail to find anything in the proposed estoppel certificate which would have made Carpenter's prosecution of the rent and possession case less difficult.

Carpenter says that with an estoppel certificate it could have discovered what happened to the tenant named in the lease, Barickman Advertising, and avoided wasting so much time and expense pursuing an action

---

**6.** We added the emphasis.

against entities not responsible. Even if we were to agree, and we do not, this would not establish a basis for Barickman's liability.

The information Carpenter says it needed was readily available in the public records on file with the Missouri Secretary of State's office.[7] Those records would have pointed Carpenter straight to BA Subsidiary in Delaware, and a telephone call to the Delaware Secretary of State's office would have revealed Bernard Hodes Advertising.

■ Although Carpenter's rights arose out of a contractual agreement, the right of indemnity is essentially equitable in nature. "Indemnification is a flexible, equitable remedy designed to accomplish a fair allocation of loss among parties[.] ... The right to indemnity stands upon the principle that everyone is responsible for the consequences of his own acts[.]" 42 C.J.S. *Indemnity* § 3 (1991). Thus, an award of indemnity should follow traditional concepts of equity, and granting Carpenter reimbursement for losses, expenses, or fees unnecessarily and unreasonably incurred would be error. Given the ready availability of the records Carpenter says it needed, we conclude that Carpenter's expenses were unnecessary and unreasonable.

Even if that were not true, we do not understand how an estoppel certificate would have aided Carpenter and made its prosecution of the rent and possession case less difficult. Carpenter cannot point to any information it would have gleaned from an estoppel certificate which would have made a difference.

Carpenter argues first that the Doyle Dane Bernbach organization was a confusing, multi-corporate conglomerate with offices around the world without any apparent tie to the lease. The public record, however, readily reports that the entity named in the lease, Barickman Advertising, became Doyle Dane Bernbach Advertising, which merged with a Delaware corporation to become Bernard Hodes Advertising. Telephone calls and standard requests for copies of public information would have cured any confusion Carpenter suffered.

Without an estoppel certificate, Carpenter was in a position of needing to rely on the public record which should have easily, and quickly, cured its confusion. We juxtapose that with the great likelihood that Fletcher/Mayo, not Barickman Advertising, would have prepared the estoppel certificate, especially in view of Fletcher/Mayo's repeated reference to itself as the tenant. Had Fletcher/Mayo prepared the certificate, Carpenter's confusion would not have been cured in the least. Indeed, it would have been lulled into persisting in the mistaken belief it apparently already had—that Fletcher/Mayo and Barickman Advertising were identical. If that likely prospect had occurred, Carpenter would have been in the same confused position it was in without an estoppel certificate. We conclude that perhaps Carpenter was in a better position without a certificate in terms of obtaining information about its tenants; certainly, it was no worse off.

Carpenter argues that "a proper" estoppel certificate would have been signed by "Doyle Dane Bernbach Advertising, Inc., *a Delaware corporation.*" [8] Even if Doyle Dane Bernbach Advertising, and not Fletcher/Mayo, had signed the certificate, it is mere speculation to conclude that it would have identified itself as "a Delaware corporation." The certificate did not ask for any entity's state of incorporation. At best, we can say only that the signer *may* have added the state of incorporation. The signer of the estoppel certificate Carpenter obtained from the other tenant did not.

Carpenter also asserts that the estoppel certificate would have identified an officer of Doyle Dane Bernbach Advertising, Inc.

7. Asked whether the information needed to trace Barickman Advertising was on file in the Secretary of State's office, Carpenter's attorney answered, "I suppose if you go though the steps and learn all of the machinations, then, yes, you could find it out through documents of public record." Barickman presented a paralegal who testified that the information could have been found by making a telephone call to the Missouri Secretary of State's office, then requesting computer records from the Missouri Secretary of State's office, and then making a telephone call to the Delaware Secretary of State's office.

8. We added the emphasis.

Carpenter's attorney testified, "If we had had an estoppel certificate with the name Doyle Dane Bernbach Advertising, Inc., in 1984 and the signature of an officer, we would have been able to find out who to sue a lot easier than what we had to go through based on what we had." We do not understand how this would have helped Carpenter, and Carpenter did not explain.

Carpenter further argues that an estoppel certificate would have revealed Barickman Advertising's successor. Carpenter already knew the identity of Barickman Advertising's successor from the information from the Missouri Secretary of State's office. But for an erroneous conclusion that the successor's merger out of state meant that it did not exist anymore, Carpenter could have traced the corporate trail to Delaware and found Bernard Hodes Advertising.

Not mentioned by the trial court or Carpenter is ¶ 23 of the lease agreement. Carpenter emphasizes that an estoppel certificate would have obtained the tenant's representation that it would "honor the assignment of the landlord's interest in the lease to [Carpenter]." Carpenter already had that assurance in ¶ 23 of the lease agreement. In that provision, Barickman Advertising agreed that "[t]he provisions . . . of this lease shall bind . . . the . . . successors and assigns of each of the parties hereto[.]" Indeed, Bernard Hodes Advertising, as successor to Barickman Advertising and Doyle Dane Bernbach Advertising, admitted full liability to perform Barickman Advertising's obligation under the lease. Carpenter was no worse off for not obtaining an estoppel certificate.

We, therefore, reverse the trial court's ruling for Carpenter on the indemnity claim.

### Fraud

■ Carpenter alleged that Barickman misrepresented that it had good title.[9] Carpenter contends that the title Barickman conveyed to it was obtained from 427 Associates, which had no title to convey to Barickman. Barickman asserts that the trial court erred in finding that he misrepresented the quality of his title to the lease. We agree.

In the Barickman Advertising lease agreement, the lessor is identified as 427 Associates. 427 Associates was a partnership consisting of James Barickman, Barickman Associates, and another organization called L & L Properties. 427 Associates obtained a 10 percent interest in the building, but it did not record its title. Carpenter concludes that because 427 Associates did not record title to the building, it did not have good title and had no interest in the leases.

Before Barickman assigned its interest in the leases to Carpenter, 427 Associates assigned all of its "right, title and interest in and to all tenant leases" to Barickman. Thus, at the time of the assignment of leases and the sale of the building, Barickman had whatever interest 427 Associates had.

Even if 427 Associates did not have title to the building (and other than the lack of recording, we know of no basis for assuming that), Carpenter did not establish that 427 Associates had insufficient interest in the space to lease it to Barickman. A building owner certainly is not the only eligible lessor. 51C C.J.S. *Landlord & Tenant* § 253 (1968).

■ That 427 Associates did not record its title is inconsequential. Recording title is not a prerequisite to valid title. 427 Associates' unrecorded title was valid as to Barickman Associates and L & L Properties. *Southern v. Southern,* 52 S.W.2d 868, 870 (Mo.1932). 427 Associates' unrecorded title could be fraudulent as against a third-party purchaser, but only if the failure to record harmed the third-party. *Clinton County Trust Co. v. Metzger's Executors,* 219 Mo. App. 365, 271 S.W. 1008, 1009 (1925).

Carpenter did not establish fraud.

---

9. Carpenter also alleged that Barickman misidentified Barickman Advertising as a division of Doyle Dane Bernbach Advertising, Inc. in the lease. The trial court did find that this was a misrepresentation which Barickman failed to disclose to Carpenter. The trial court, however, failed to make findings on other essential elements of misrepresentation in relation to this particular allegation; therefore, we find that the trial court based its finding for Carpenter on the fraud count on the misidentification of the lessor, not on the misidentification of the lessee.

## Conclusion

We reverse the trial court's judgment for Carpenter on its breach of contract and fraud claims. We conclude that Carpenter presented insufficient evidence to support either. Because of this conclusion, we need not address the other points raised by Barickman on appeal.

All concur.