**AMERICAN LAMINATES, INC., Respondent,**

v.

**J.S. LATTA COMPANY, Appellant.**

**No. WD 54288.**

Missouri Court of Appeals, Western District.

Sept. 1, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 27, 1998.

Application for Transfer Denied Dec. 22, 1998.

Barry Pickens, Kansas City, for Appellant.

Charles William Fairchild, Kansas City, for Respondent.

SPINDEN, Judge.

J.S. Latta Company[1] is arguing with American Laminates, Inc.,[2] over whether their contracts, memorialized in a dealer agreement and in purchase orders, obligated American Laminates to pay disputed backcharges on four school projects in Iowa and one project in Kansas City and whether American Laminates was entitled to lost profits for a New York project which Latta cancelled. The circuit court awarded American Laminates $38,059 in damages, including prejudgment interest, and Latta appeals.

We issued an opinion on June 23, 1998, affirming the circuit court's judgment in part and reversing in part. We granted Latta's motion for rehearing filed on July 8, 1998, to reconsider issues involving the contract doctrines of commercial frustration and commercial impracticability. We again affirm the

---

1. The company is a division of School Specialty, Inc., a Wisconsin corporation, whose headquarters are in Cedar Falls, Iowa. It is a wholesale distributor of school supplies and equipment.

2. American Laminates is a Missouri corporation whose offices and manufacturing facilities are in Kansas City, Kansas. It manufactures and supplies plastic laminated casework, including counter tops, institutional casework, and store fixtures.

circuit court's judgment in part and reverse it in part. We remand the case for further proceedings.

## BACKCHARGES

On November 23, 1994, American Laminates received a letter from Todd Ellison, Latta's contract manager, claiming backcharges which Latta had incurred on various projects:

| | |
|---|---|
| Backcharge from Iowa Precision installation for Ballard Elementary Schools | $ 807.20 |
| Backcharge from Iowa Precision Installation for Prairie Valley Elementary School | $ 1,772.00 |
| Backcharge from Iowa Precision Installation for West Liberty Middle School | $ 1,713.20 |
| Backcharge from Unzeitig Construction for Maquoketa Community Schools | $ 3,229.54 |
| Bill from GPJS Architects at Prairie Valley to take window out due to music cabinet to [sic] big | $ 225.00 |
| Rejection of nurse's desk (elevation 7) by GPJS at Prairie Valley | $ 150.00 |
| Charge from R.E. Simon for not fulfilling contract at Nathan Weiner project | $ 3,000.00 |
| Backcharges from R.E. Simon for Nathan Weiner project | $ 1,068.33 |
| Backcharges from R.E. Simon for poor quality of conference table top | $ 1,609.07 |
| Backcharge Total— | $13,574.34 |

Ellison reported that Latta was subtracting the $13,574.34 backcharge total from the $14,761.80 which Latta owed American Laminates because of outstanding invoices on other projects.

American Laminates sued Latta, alleging that Latta's claim of backcharges was without merit. The circuit court agreed and held that the supporting documentation for the backcharges was incomplete, untimely and without merit. The circuit court found, however, that Latta was entitled to a $750 offset for American Laminates' failure to furnish decorative wood coverings for a conference room table for the Nathan Weiner project. The circuit court awarded American Laminates $12,825 and nine percent prejudgment interest.

Latta appeals, claiming that American Laminates had an obligation to indemnify it for all the backcharges assessed against it by American Laminates' dissatisfied customers. Latta relies on its purchase order to support its contention. The indemnity clause in the purchase order provides that American Laminates "agrees to indemnity [3] and holds [Latta] harmless from and against all claims, damages and expenses on account of ... any defect in the merchandise shipped on this order and subsequently sold by us." [4]

Neither the dealer agreement [5] nor the purchase order defined backcharges. We found no definition of the term in any of the parties' documents. They apparently operated with an assumption that each understood what the term meant.

The circuit court found, "Backcharges are expenses that Latta, as the dealer, incurs on the job site and is responsible to pay. Typical backcharges include damage to walls or paint during installation. Backcharges may or may not be the responsibility of American Laminates, and must therefore be properly documented." [6] In its brief, American Laminates defined backcharges as "repair expenses that result from damages caused to

---

**3.** We assume that this was intended to be "indemnify."

**4.** From the exhibits in the record, only one purchase order contains this language: the purchase order for the Nathan Weiner project. American Laminates, however, does not contest that this language appeared on all of Latta's purchase orders.

**5.** The dealer agreement said, "If backcharges are the responsibility of [American Laminates] then

[American Laminates] shall pay for the backcharge. If backcharges are the responsibility of [Latta] then [Latta] shall pay for the backcharge. All backcharges must be properly documented."

**6.** The circuit court's conclusion confuses us. In one breath, it says that backcharges are expenses that Latta has the responsibility to pay for, but, in the next breath, it says that backcharges may or may not be American Laminates' responsibility.

**16**

finished work by other trades. Typical [American Laminates] related backcharges could include damage to walls or paint during the process of installing casework. Back charges may or may not be the responsibility of [American Laminates], and must therefore be properly documented." The only definition we could find in the record regarding backcharges was provided by Matthew Barksdale, American Laminates' president, who said that backcharges were "problems that weren't anticipated on the job initially or things basically to make the job complete. Additional items that need to be sent to make the job complete and make it acceptable for the owner."

Most of the backcharges claimed by Latta involved problems with the casework, such as replacing doors, installing missing hardware, laminating cabinets which were not finished, cleaning glue from cabinets, leveling casework, trimming casework, and removing and replacing counter tops. The circuit court did not question whether these items were indeed backcharges. Instead, it concluded that the backcharges were "incomplete, untimely and without merit."

 Latta seems to argue that the circuit court's finding was erroneous because American Laminates was obligated to pay its backcharge claims caused by any defect in the casework regardless of the time the damages or expenses arose.[7] Latta rests its argument solely on its purchase orders' indemnity clauses in which American Laminates agrees to indemnify and to hold Latta harmless "from and against all claims, damages and expenses." We reject this contention as manifestly unreasonable.

Section 400.2–607(3)(a), RSMo 1994, says, "Where tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]" Concerning reasonable time, § 400.1–204, RSMo 1994, says:

(1) Whenever this chapter requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement.

(2) What is reasonable time for taking any action depends on the nature, purpose and circumstances of such action.

Latta received and accepted all the casework for the school projects. American Laminates became aware of the backcharges for the school projects only after receiving Ellison's letter on November 23, 1994, nearly a year or so after American Laminates had been paid in full. We agree with the circuit court that Latta did not notify American Laminates of the backcharges within a reasonable time.

Moreover, we also agree with the circuit court that Latta's supporting documentation for the school projects was incomplete. Reasonableness seems to dictate that the more time which passes between Latta's acceptance and its claim for a backcharge, the more detailed supporting documentation has to be. American Laminates had a right to be assured in a claim made after a long passage of time that a defect was its fault and not caused by others. The documentation submitted by Latta established little about the cause for the defects.

 As to the Nathan Weiner project, the evidence established that American Laminates and Latta executed an initial purchase order for $26,012 for the manufacture and installation of laminated casework, including 15 work stations, a desk surface and a round table. American Laminates received a second purchase order from Latta on October 26, 1993, for the manufacture and installation of window sills, and a third purchase order on November 11, 1993, for $2732 for the manufacture and installation of a conference room table. American Laminates billed the project on January 31, 1994, and on April 21, 1994, and all but $3252 was paid. Latta claimed backcharges totalling $5677.40 on November 23, 1994.

---

7. Latta does not discuss the dealer agreement which required it to "notify [American Laminates] within 24 hours of any problems with a delivered job." If Latta failed to notify American Laminates within that time, it agreed that it would be responsible for any damage and shortages. Latta did not notify American Laminates within 24 hours of any problem for which it later made a backcharge claim.

The first claim, for $3000, concerned lack of decorative wood coverings for a conference room table's steel legs. The circuit court concluded that the $3000 backcharge for American Laminates' failure to furnish decorative wood coverings for the legs was unreasonable because the purchase order for the entire table totaled $2732, and the backcharge would be more than the whole table's worth. Evidence established that the wood coverings had a value of $420 and that American Laminates offered a credit of $750 for the legs.

The second claim, for $1068.33, concerned:

| | | |
|---|---|---:|
| 1.) RDF Furniture—Temporary furniture rental= | | $ 311.88 |
| 2.) RDF Furniture—Delivery of temporary furniture= | | $ 75.00 |
| 3.) Feingold & Associates—Extra time trying to help American Laminates= | | $ 212.50 |
| 4.) Firebaugh Construction Company—One fourth of cost due to poor installation. Balance paid for by Nathan Weiner due to uneven walls= | | $ 198.75 |
| 5.) Owens Enterprises | | |
| a.) Cost to trim countertops and pillars= | | $ 176.00 |
| b.) Cost to level synthetic marble= | | $ 443.00 |
| c.) Cost of leveling systems for counters and desks= | | $ 435.00 |
| d.) Cost to level and stabilize round table= | | $ 368.20 |
| **TOTAL CHARGE BACKS** | | $ 2,220.33 |
| Off Set Amounts— | | |
| Steel base for conference table= | | (–970.00) |
| Extra hardware for Larry's cabinet | | (–182.00) |
| **TOTAL BACK CHARGE AMOUNT** | | **$ 1,068.33** |

The circuit court concluded that the backcharge was "incomplete, untimely, and without merit" for these reasons:

The casework was installed prior to the furniture rental, the furniture was unnecessary, and even if furniture had to be rented as a result of delay on the project, the delay was caused by the architect, General Contractor and Owner.

The backcharge for Feingold Associates Architects is without merit, and is not customary or ordinary in this industry. Further, many of the architect's drawings lacked sufficient detail, and [American Laminates] did not charge the architect for interpreting those drawings. The architect's drawings for the cabinet in Nathan Weiner's office did not show lateral file drawers, but [American Laminates] remade the cabinet at its cost and did not charge the architect for improper drawings.

The backcharge by Firebaugh Construction Company is without merit, as [American Laminates] did not contract nor was it responsible for installation of the walls. Moreover, many of the walls were round and uneven.

The backcharge by Owens Enterprises to trim countertops and pillars is without merit in that it is not customary or ordinary in the industry to scribe standard cube shaped casework to walls, particularly rounded ones. Moreover, to scribe casework to the wall prevents the materials to expand and contract, and therefore explains why backsplashes are typically used, but for the Nathan Weiner project; and

The backcharges from Owens Enterprises to level the synthetic marble, counters and desks and to level and stabilize the round table, all of which were in Nathan Weiner's office, are without merit. [American Laminates] did not supply, as a mate-

rial, the synthetic marble, and the scope of [American Laminates'] Purchase Order was to manufacture casework cores for the large round table and desk area, into which the marble was to be inlaid by other workers. The synthetic marble was rough and broken to begin with, but the cores were manufactured in accordance with the architect's drawings. Furthermore, the round table and desk support were improperly designed by the architect. The round table had a diameter of 54 inches, was large and heavy due to the synthetic marble, but only had three legs. [American Laminates] made several suggestions to the architect, but was told to manufacture the round table per the architect's drawings. The long desk peninsula, over six feet long, had only one support leg, but [American Laminates] fabricated the core per the architect's drawings.

As to the third backcharge of $1609.07 for a poor quality conference tabletop, the circuit court also found that the backcharge was without merit. Evidence established that the first tabletop was rejected, and American Laminates agreed to manufacture a second one. The circuit court held that when the second tabletop left American Laminates' factory it was "in perfect condition and totally acceptable." The circuit court concluded that Nathan Weiner unreasonably rejected it and then kept and used it without paying for it.

Latta's only response to the circuit court's findings is that the purchase orders' indemnity clauses required American Laminates to hold it harmless from all damages and expenses caused by defective casework. The indemnity clause, however, did not obligate American Laminates to pay unreasonable charges. As we said in *Carpenter–Vulquartz Redevelopment Corporation v. James H. Barickman Associates*, 886 S.W.2d 634, 638 (Mo.App.1994):

> Although [a party's] rights arose out of a contractual agreement, the right of indemnity is essentially equitable in nature. "Indemnification is a flexible, equitable remedy designed to accomplish a fair allocation of loss among parties[.] ... The right to indemnity stands upon the principle that everyone is responsible for the consequences of his own acts[.]" 42 C.J.S. *Indemnity* § 3 (1991). Thus, an award of indemnity should follow traditional concepts of equity, and granting [a party] reimbursement for losses, expenses, or fees unnecessarily and unreasonably incurred would be error.

Latta does not challenge the circuit court's findings that the charges were unreasonable. It argues only that the indemnity clauses obligated American Laminates to pay even if the charges were unreasonable. The contention is without merit.

## LOST PROFITS

Latta also appeals the circuit court's judgment awarding American Laminates $18,993 plus nine percent interest for its lost profits for a New York project which Latta cancelled. Latta contends that American Laminates was not entitled to the judgment because (1) Latta's cancellation was excused because of commercial frustration or commercial impracticability; (2) Latta's cancellation was timely; and (3) a valid and enforceable contract did not exist for the New York project. Latta also argues that the circuit court miscalculated the damages.

Evidence established that on December 9, 1992, American Laminates submitted a bid and specifications to Latta for institutional casework for the Bishop Mugavero Center in New York. Latta's contract for the project was with Newman Millworks, a subcontractor for Turner Construction, the New York contractor. Newman Millworks was based in Iowa and was in Latta's trade territory. American Laminates and Latta executed a purchase order on August 24, 1993, which was replaced by an updated purchase order on August 30, 1993, for $94,964. The project required American Laminates to build 288 base cabinets and 288 tall cabinets and to provide laminate countertops. After receiving the purchase order, American Laminates began drafting shop drawings and preparing for the project. It also scheduled the production time for the project for late 1993 or early 1994.

On May 11, 1994, Ellison told Dale Coulter, head of American Laminates' production

scheduling, that the project had been cancelled. Ellison testified:

> When I first heard about the project I got a call [from] Bill Newman who is the owner of Newman Mill Works outside of Iowa. He contacted American Laminates about a potential project in New York and he was interested in getting a price from them. They in turn sent him our way to receive pricing for them. As it turned out Bill Newman was a subcontractor with a contractor in New York, I believe it was Turner, and during the course of the whole project here, Bill Newman had a contract with Turner Construction and in turn Turner Construction was owned by two brothers who split up. Bill Newman's contact was the one brother that didn't retain the contract, it was the other brother. He—this happened after he told us to go ahead with the purchase order, which I sent to American Laminates.
>
> And then what ended up happening is Bill Newman had lost the contract, the other contractor was worried about financial obligations from them, whether they would actually be able to pay. So in turn he cancelled the order through us. During the process shop drawings were made, no shop drawings were ever approved or sent back. In turn, I had called American Laminates and advised them what happened and told them that we lost the contract and therefore would not be able to proceed with the job.
>
> . . . .
>
> [Bill Newman] was leery that there was a cash flow problem and he was worried about whether they actually had money to proceed with the project.
>
> . . . .
>
> [H]e told me that—he denied he had the contract.
>
> [It was Latta's understanding that Turner's contract with Newman Millworks had been cancelled and the contract was relet to a different vendor.]

On December 13, 1994, American Laminates demanded that Latta pay $23,741, which was a 25 percent gross profit margin for the project. Latta refused. American Laminates sued Latta for breach of contract, and the circuit court awarded American Laminates 20 percent gross profits, which was $18,933, plus nine percent prejudgment interest.

■ The commercial frustration doctrine excuses performance of contractual obligations when a happening, not foreseen by the contractors, destroys, or nearly destroys, the contracted performance's value or the contract's purpose—provided the contractors did not cause the happening and were unable to avoid its consequence. *Howard v. Nicholson*, 556 S.W.2d 477, 481–82 (Mo.App.1977). To preserve the certainty of contracts, we apply this doctrine sparingly—only when its application would not work an extreme hardship. *Id.* at 483.

■ Given the lack of evidence concerning Newman Millworks' cancellation of the project with Latta, we cannot say that the circuit court erred in concluding that the commercial frustration doctrine did not apply. Latta provided only the barest of specifics concerning the cancellation. The only evidence we found concerning Newman Millworks' cancellation of the order was Ellison's testimony, and the situation he described was hardly a proper one for application of the commercial frustration doctrine.

Latta asserts that the cancellation was beyond its control. Ellison said that Newman Millworks cancelled because Bill Newman was "leery" about the general contractor's financial condition. Ellison also reported, however, that the general contractor eventually contracted with another vendor to purchase cabinets. We know little more than this. Did Newman Millworks breach a contractual obligation which Latta could have enforced? What steps did Latta take to enforce its agreement with Newman Millworks? We presume that Latta had a remedy if Newman Millworks' cancellation breached its agreement with it. *See* JOHN D. CALAMARI AND JOSEPH M. PERILLO, CONTRACTS § 13–16 (3d ed.1987).[8] If it did not have an

---

8. Calamari and Perillo suggest that U.C.C. § 2–615, cmt. 5, may recognize the defense of im-

practicability in cases where a middle party turns over its contractual rights to the plaintiff. We

enforceable contract with Newman Millworks, why was it entering an order with American Laminates? What was Latta's and American Laminate's custom and practice concerning cancellations? Were these cabinets so unique to the New York project that they could not be resold to anyone else? The record does not tell us.

On this basis alone, we are obligated to reject Latta's point, but even the sketchy facts we do have suggest that this is not an appropriate case for application of the doctrine. The doctrine's purpose is to do equity—to intervene when enforcement of a contract would be unjust. "The introduction of the doctrine of commercial frustration of purpose was no doubt necessary in order to 'do justice'; that is, in order to allocate risks of harm through supervening events in accordance with the current practices and notions of reasonable men." 6 CORBIN ON CONTRACTS § 1361, p. 495 (1962). The doctrine determines where the courts should allocate risk for uncontemplated happenings which destroy, or nearly destroy, the value or purpose of a contract between two parties which have not brought on the happening.

We do not understand the basis on which Latta asks us to allocate the risk of Newman Millworks' cancellation to American Laminates. What little evidence we find on the subject suggests that Latta was in a better position to defend against Newman Millworks' cancellation. It apparently contracted directly with Newman Millworks, and it, not American Laminates, was in a position to ward off Newman Millworks' backing out of the deal. Latta has given insufficient reason to convince us that American Laminates should have borne the risk of Newman Millworks' cancellation.

Latta relies heavily on *Howard v. Nicholson*, 556 S.W.2d 477 (Mo.App.1977), a case in which a landowner cancelled its contract for erection of a bridal salon. It asserts that the circumstances in that case are remarkably similar to the facts in this case. The land-

owner in that case, however, answered the questions left unanswered by Latta. Given the sketchy details supplied by Latta, we have no basis for judging whether its case was similar to *Howard* or any other case. Moreover, the *Howard* court ruled that a building erected to house a bridal salon was so unique "that it was not suited for other uses." *Id.* at 483. While we are quite doubtful that buildings housing bridal salons are so unique that they have no other purpose,[9] we accept at face value the facts as reported in the case: The building was so unique that it precluded the owner's using it for any purpose other than a bridal salon.

We do not know that about American Laminate's cabinets. Although we do know that American Laminates was preparing to fabricate the cabinets specifically suited for the New York project, we also know that American Laminates was using standard dimensions. It bid its standard cabinets. Although Latta emphasizes that American Laminates was to prepare the cabinets specifically for the New York project and infers that they would have no use anywhere else, we do not discern why the circuit court's rejection of that inference was unreasonable. Surely, Latta would have had to expend additional resources to find another buyer and might have had to suffer a loss on the cabinets, but we do not discern anything in the record which requires the inference that the cabinets were so unique to the New York project that they were of no use anywhere else. For this reason, Latta's reliance on *Howard* is misplaced.

Latta also cites *Chase Precast Corporation v. John J. Paonessa Company, Inc.*, 409 Mass. 371, 566 N.E.2d 603 (1991). Again, however, the defendant in that case presented details which permitted the court to apply the doctrine. Such details are missing from Latta's case.

■ The Uniform Commercial Code recognizes a doctrine similar to the doctrine of commercial frustration—the doctrine of com-

---

found no evidence that Latta turned over to American Laminates its contractual rights. See § 13–16, n. 7.

9. As we witness the conversion of former industrial buildings into law offices and even residences, we realize that buildings rarely have a function so unique that they are not suited for other uses.

mercial impracticability. Section 400.2–615, RSMo 1994, says:

> Except so far as a seller may have assumed a greater obligation and subject to section 400.2–614 on substituted performance:
>
> (a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.[10]

Latta argues that this doctrine would also operate to excuse its performance. Not so. The same evidentiary "road blocks" which thwarted application of the commercial frustration doctrine also thwart application of the commercial impracticability doctrine. Latta had the burden of proving that its performance was made impracticable, *Nora Springs Cooperative Company v. Brandau,* 247 N.W.2d 744 (Iowa 1976), and it simply did not present sufficient evidence to overcome the circuit court's conclusion that Latta's performing its contractual obligations was not impracticable. Latta's merely suffering a loss did not establish that its performance was commercially impractical. *Missouri Public Service Company v. Peabody Coal Company,* 583 S.W.2d 721, 728 (Mo. App.), *cert. denied,* 444 U.S. 865, 100 S.Ct. 135, 62 L.Ed.2d 88 (1979).

■ Latta also contends that its performance was excused because its cancellation was timely. Latta points out the purchase order's provision that Latta "reserve[d] the right to cancel at any time any portion of an order which has remained unshipped either as a result of back order or beyond cancellation date that may be contained herein." The right to cancel unshipped orders was not unconditional. The right was conditioned on the order's not being shipped because of a back order or not being shipped by a specified cancellation date. Latta's cancellation did not involve back orders, and the purchase order did not specify a cancellation date. This necessarily meant that Latta could not use the provision as a means for cancelling without liability. Neither of the conditions for invoking the provision were satisfied.

■ Latta alternatively argues that it did not have a valid contract with American Laminates for the New York project. It asserts that no competent evidence existed to establish that the parties reached an agreement on all essential terms. Latta points in particular to the lack of agreement concerning design specifications,[11] field dimensions and color specifications for the cabinetry.

American Laminates' bid to Latta for the New York project provided:

> FOR THE NET SUM OF: NINETY FOUR THOUSAND NINE HUNDRED SIXTY FOUR DOLLARS
>
> $ 94,964.00
>
> WE PROPOSE TO FURNISH: AMERICAN LAMINATES STANDARD SERIES CASEWORK, FOB FACTORY. SEE ATTACHED SPECIFICATIONS FORM FOR EXACT CONSTRUCTION DETAILS PROPOSED.
>
> BASIS OF QUOTE:
>
> This quote is our estimate based on information supplied by you. Above prices are valid for shipment within 18 months of

---

**10.** UCC § 400–2.615, cmt. 9, recognizes that this section also applies to buyers.

**11.** In an August 31, 1993, letter to Ellison, Robert Newell, American Laminates' account manager, said, "I did not have the specs when we bid the original bid for Bishop Mugavero. Please verify that we are approved to bid our standard." According to Newell, "When we don't have specifications, we bid our standard. And then it's up to the dealer to go get our standard approved and that's why I've asked him, 'Please see if you can get our standard approved.' I bid our standard product.... It's standard procedure when you bid. When you bid somebody will call you in and ask you to bid something or they will send you something to bid, if the architect's specifications do not accompany the bid or the request for proposal, we will bid our standard.... And ask to get our standard approved by the architect.... The general course of the industry is that the architect needs to approve what we're providing."

quote date. Add .5% per month for shipment thereafter.

PLAN SHEETS: NONE

ELEVATIONS: NONE

SPECIFICATIONS: AMERICAN LAMINATES STANDARD CONSTRUCTION

See attached Specification Form for exact construction details proposed

ESTIMATED DELIVERY DATE: 3RD QUARTER 1993

PHASES FOR DELIVERY: ONE

PHASES FOR INSTALLATION: NA

ADDENDA:

WE EXCLUDE THE FOLLOWING: UNLOADING, INSTALLATION, SALES TAX, VINYL BASE [12]

Prices are based on estimated delivery dates & phases as detailed above. Any additional phases for delivery or installation will be at an upcharge of $1,500.00 per additional phase.

Cabinet Count Totals:

Base: 288 Wall: Tall: 288

Brand of Laminate Specified: NONE If none, see below.

Colors Specified: NA

American Laminates prices are established for Wilson Art, Formica, and Nevamar "BASE PRICES". All premium priced laminates are subject to factory upcharges. Please consult your laminate representative or American Laminates for "Base Priced" laminates.

————ALL PROPOSALS NOT ACCEPTED WITHIN 30 DAYS OF QUOTE DATE, SUBJECT TO REVIEW BY AMERICAN LAMINATES————

Unless specified above otherwise this proposal does not include sales or use tax or any present or future taxes that may be imposed against the materials covered by this proposal. Any Purchase Order issued by you will be deemed an acceptance of this quotation and our General Specifications as outlined in our Architectural Specifier Reference Guide. Delivery to be approximately 90 days after approved shop drawings, final field dimensions, and final color selections, Unless predetermined by scheduler prior to receipt of order.

TERMS: NET 30—DAYS

Robert L. Newell of American Laminates signed the bid, and Ellison signed the "Accepted By" line on August 30, 1993. Latta also sent a purchase order which provided in the description section, "Casework per plans," and set the price at $94,964.

Latta accepted American Laminates' bid for 288 base cabinets and 288 tall cabinets. It also accepted that the laminates would be at the base price. By issuing its purchase order, Latta also accepted the price quotation of $94,964 and that the casework would be built pursuant to American Laminates' standard specifications. Latta recognized and accepted that American Laminates needed "approved shop drawings, final field dimensions and final color selections" before American Laminates could deliver the order.

■ To be enforceable, a contract's nature and the extent of its obligations must be certain. If essential terms are reserved for the parties' future determination, the agreement is not enforceable. *Gateway Exteriors, Inc. v. Suntide Homes, Inc.*, 882 S.W.2d 275, 279 (Mo.App.1994). A contract requires a "meeting of the minds" which the court determines by looking to the parties' intentions as expressed or manifested in their words or acts. *Id.* Section 400.2–204(3), RSMo 1994, says, "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

The essential terms of Latta's and American Laminates' contract were not reserved for future determination. Although Latta and American Laminates had not agreed on color choices and exact measurements, these were not essential terms. Evidence established that the parties agreed that American Laminates would build 288 base cabinets and 288 tall cabinets with base priced laminates for $94,964. Latta accepted American Lami-

---

**12.** The words "VINYL BASE" were handwritten.

nates' terms that it would deliver the case-work 90 days after it received approved shop drawings, final field measurements and final color selections.

Latta also contends that the contract lacked mutuality because American Laminates' consideration was made illusory by its reserving the right not to perform. Latta relies on a provision in American Laminates' bid which said, "All proposals not accepted within 30 days of quote date, subject to review by American Laminates." Retaining the right to cancel a contract or to avoid one's promise is an unenforceable, illusory promise. *Fenberg v. Goggin*, 800 S.W.2d 132, 136 (Mo.App.1990).

American Laminates' right to review was not a right to cancel the contract. It merely was a right to review if Latta made changes in the contract's specifications. American Laminates' reservation to review was not an illusory promise.

Latta also contends that the circuit court erred in calculating damages for the New York project. The circuit court awarded American Laminates 20 percent of the gross profits, a total of $18,993. Latta asserts that American Laminates did not prove its lost profits with reasonable certainty.

Section 400.2–708, RSMo 1994, governs how damages are to be measured in such cases as this. Section 400.2–708(1) provides that American Laminates' damages should be the difference between the market price at the time and place for tender and the unpaid contract price plus any incidental damages less expenses saved by American Laminates because of Latta's cancellation. If this is inadequate to put American Laminates in as good a position as performance would have put it, § 400.2–708(2) provides that the court must award profit, including reasonable overhead, which American Laminates would have made but for the breach.

American Laminates had the burden of proving the existence and amount of damages with reasonable certainty. *Scullin Steel Company v. Paccar, Inc.*, 708 S.W.2d 756, 761 (Mo.App.1986). American Laminates had to present a basis for a rational estimate of damages without resorting to speculation. *Meridian Enterprises Corporation v. KCBS, Inc.*, 910 S.W.2d 329, 331 (Mo.App.1995).

American Laminates offered financial summaries as proof of its lost profits for the New York project. One of the summaries established that its gross profit margin was 25.3 percent for 1993, 26.8 percent for 1994, 30.1 percent for 1995, and 30.9 percent for 1996. The summary also provided breakdowns of the percentages and money spent on materials, labor, delivery, and installation for the goods sold for those years. For 1993, the year in which Latta accepted American Laminates' bid for the New York project, American Laminates had total sales of $8,316,492. Its cost of materials for those sales was $4,073,458 (49%); its labor cost $1,722,015 (20.7%); and its delivery costs were $418,827 (5%). Total cost of goods sold was $6,214,300 (74.7%). The remaining $2,102,192 was gross margin (25.3%). In 1994, the year in which Latta cancelled the New York project, American Laminates' sales totalled $12,501,081. Its cost of materials for these sales was $6,073,725 (48.6%); its labor cost $2,524,924 (20.2%); and its delivery costs were $555,398 (4.4%). Total cost of goods sold was $9,154,047 (73.2%). The remaining $3,347,034 was gross margin (26.8%).

When cross-examined about these figures and percentages, American Laminates' president, Matthew Barksdale, said that in 1993 the bulk of the work that American Laminates did involved institutional casework. He said that 50 to 75 percent involved institutional casework and 20 percent involved counter tops. By the end of 1994, Barksdale acknowledged that American Laminates had phased out completely its institutional casework.

This evidence provided a basis for a *rational estimate* of American Laminates' lost profits. Reasonable certainty, not absolute certainty, was required.

Latta contends, however, that the circuit court arbitrarily selected a 20 percent profit margin—that no evidence established it was an appropriate measure of damages. While we agree that no one said explicitly that 20 percent was the appropriate margin, the evi-

dence established that the yearly totals and percentages for the sale of goods included jobs not involving counter tops and institutional casework. The circuit court obviously took this into consideration in setting its percentage.

■ Latta also asserts that the circuit court erred in awarding American Laminates its gross, instead of net, profits. Latta argues that American Laminates was not entitled to recover damages for overhead. We disagree.

The circuit court found, "[American Laminates] maintains and has to pay ongoing fixed expenses, including but not limited to equipment costs and maintenance, front office employee salaries and benefits, workers compensation and other insurance, rent, computer systems, and so forth, which are paid for from the gross profits earned on projects." The circuit court awarded American Laminates 20 percent of its gross profits for the New York project which included these overhead expenses.

Section 400–2–708, RSMo 1994, says:

(1) Subject to subsection (2) and to the provisions of this article with respect to proof of market price (section 400.2–723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this article (section 400.2–710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (section 400.2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

The principle governing breaches of sales contracts is to give the aggrieved party the benefit of the contract by putting the party in as good a position as the party would have been in had the breaching party performed the agreement.

Latta contends that by awarding American Laminates its overhead for the project American Laminates received an undeserved windfall. Latta, however, does not explain how this is so. We believe the obverse is true because American Laminates' overhead continued despite Latta's breach. To be in as good a position as it would be in had Latta not breached, American Laminates would have had to allocate the overhead figured into Latta's contract into one less contract thereby reducing the profitability of each of its other contracts and its total profit for the period. By awarding American Laminates its gross profits, including overhead, the circuit court put American Laminates in as good a position as it would have enjoyed had Latta performed the agreement.

## PREJUDGMENT INTEREST

In its last point, Latta asserts that the circuit court erred in awarding American Laminates prejudgment interest. It contends that it should not have awarded prejudgment interest for both the award for amounts related to the school projects and Nathan Weiner project and the award for gross profits for the New York project.

■ A general rule mandates that circuit courts not award prejudgment interest for an unliquidated claim because the liable party did not know the amount it owed and should not be considered in default for failure to pay. *Fohn v. Title Insurance Corporation of St. Louis*, 529 S.W.2d 1, 5 (Mo. banc 1975). The circuit court, on the other hand, may award interest when it finds that the amount is indisputably due under the contract. *Scullin Steel Company*, 708 S.W.2d at 766. To be liquidated so as to bear interest, a claim must be fixed and determined or readily determinable. An award of interest is proper if the claim is ascertainable by computation or a recognized standard. *Id.*

■ Latta asserts that American Laminates was not entitled to prejudgment interest on the school projects and Nathan Weiner project because Latta "did not reasonably

know the amount it owed American Laminates, if any, on these projects. [Latta] reasonably believed that it was entitled to offsets[.]" We disagree.

According to *Burger v. Wood,* 446 S.W.2d 436, 444 (Mo.App.1969); *questioned* on *other grounds, Brickner v. Normandy Osteopathic Hospital, Inc.,* 746 S.W.2d 108 (Mo.App. 1988):

> [T]he right of one party to recover interest on a liquidated demand is not necessarily dependent upon a showing that all claims interposed by his adversary are likewise liquidated.... [W]here plaintiff's demand is liquidated, the interposition of an unliquidated counterclaim or set-off does not convert the liquidated demand into an unliquidated one or preclude plaintiff's recovery of prejudgment interest, even though such counterclaim or set-off puts the amount payable in doubt.

The amount due and owing to American Laminates from the school projects and Nathan Weiner project were liquidated amounts. It was Latta's claim of backcharges that was unliquidated. The circuit court properly awarded prejudgment interest for this claim.

Latta also claims that the circuit court erred in awarding prejudgment interest on American Laminates' claim for gross profits on the New York project. We agree.

■ Prejudgment interest is not allowed on damages for lost profits. *Scullin Steel Company,* 708 S.W.2d at 766 (relying on *Wiggins Ferry Company v. Chicago and Atlas Railroad Company,* 128 Mo. 224, 27 S.W. 568, 574 (1894)). Moreover, the claim for damages for the New York project was an unliquidated claim. The claim was not fixed or readily determinable until the circuit court determined the appropriate gross profit percentage after hearing the evidence. Hence, we conclude that the circuit court erred in awarding prejudgment interest for the New York judgment. We reverse and remand to the circuit court for it to enter its judgment accordingly.

## CONCLUSION

We affirm the circuit court's judgment awarding American Laminates its damages in regard to the school projects and Nathan Weiner project, including prejudgment interest. We also affirm the circuit court's judgment awarding American Laminates its gross profits for the New York Project, but we reverse the circuit court's judgment granting prejudgment interest in regard to this project.

BRECKENRIDGE, P.J., and RIEDERER, J., concur.